# United States Court of Appeals

### For the Eighth Circuit

_____

No. 17-2721

_____

United States of America

*Plaintiff - Appellee*

v.

Allen E. Peithman, Jr.

*Defendant - Appellant*

_____

No. 17-2722

_____

United States of America

*Plaintiff - Appellee*

v.

Allen E. Peithman, Jr.

*Defendant - Appellant*

_____

No. 17-2723

_____

United States of America

*Plaintiff - Appellee*

v.

AEP Properties, L.L.C.

*Defendant - Appellant*

_____

No. 17-2768
_____

United States of America

*Plaintiff - Appellee*

v.

Sharon A. Elder

*Defendant - Appellant*

_____

Appeals from United States District Court
for the District of Nebraska - Lincoln

_____

Submitted: November 14, 2018
Filed: February 27, 2019

_____

Before BENTON, BEAM, and ERICKSON, Circuit Judges.

_____

ERICKSON, Circuit Judge.

In 2013–2014, law enforcement officers in Lincoln, Nebraska, began focused investigations on "smoke shops" selling "potpourri," a product containing synthetic marijuana that when consumed sometimes resulted in significant adverse health effects. "Dirt Cheap" owned by Allen E. Peithman, Jr. and "Island Smokes" owned by Sharon A. Elder were two of the shops investigated. Elder is Peithman's mother.

-2-

Peithman, AEP Properties, and Elder[1] were charged in a 14-count indictment. The indictment contained conspiracy charges pertaining to the distribution of drug paraphernalia, the distribution of misbranded drugs, structuring more than $100,000 in a 12-month period, mail fraud, the commission of money laundering as well as other charges relating to the maintenance of drug-involved premises and investment of illegal drug proceeds. The indictment also included forfeiture allegations. Following a 13-day trial, the jury acquitted Peithman, AEP Properties, and Elder on some counts and convicted them on other counts. The district court sentenced Peithman to a total term of 115 months' imprisonment for the convictions at issue in this appeal[2] and a consecutive 14-month term of imprisonment for violating his conditions of supervised release. Elder was sentenced to a total term of 63 months' imprisonment.[3] AEP Properties was fined $450,000 and ordered to pay a special assessment in the amount of $400. A joint and several money judgment in the total amount of $1,142,942.32 was ordered to be paid by Peithman, AEP Properties, Elder, and Cornerstone Plaza (a company Elder owned). The court imposed a fine in the amount of $500,000 against both Peithman and Elder and ordered each to pay $5,186.56 in restitution.

---

[1]One other individual and one other corporation were also charged and convicted of one or more offenses in this case, but they have not appealed.

[2]The entire sentence consisted of 115 months' imprisonment on Counts IX (investment of illicit drug profits), XI (conspiracy to commit mail fraud), and XII (conspiracy to structure more than $100,000 in a 12-month period); and concurrent terms of 36 months on Counts VIII (conspiracy to distribute and possess with intent to distribute drug paraphernalia) and X (conspiracy to distribute misbranded drugs with intent to defraud or mislead).

[3]The entire sentence consisted of 63 months' imprisonment on Counts IX (investment of illicit drug profits), XI (conspiracy to commit mail fraud), and XII (conspiracy to structure more than $100,000 in a 12-month period); and concurrent terms of 36 months on Counts VIII (conspiracy to distribute and possess with intent to distribute drug paraphernalia) and X (conspiracy to distribute misbranded drugs with intent to defraud or mislead).

Peithman raises two clusters of issues on appeal: (1) sufficiency of the evidence, and (2) various assertions of substantive and procedural errors. Peithman contends the evidence was insufficient to sustain a conspiracy or that illegal profits were invested. In his second barrage of claims, he argues the district court erred when it denied his motion for a new trial; when it ordered the money judgment to be joint and several and found equal culpability among the parties; when it failed to remove a juror who was ill during the trial; when it calculated the Sentencing Guidelines; and when it failed to grant a more substantial downward variance.

Elder also raises numerous challenges. She asserts that the evidence was insufficient to sustain convictions for distributing misbranded drugs and structuring. She joins Peithman's claim that the money judgment was imposed in error, and argues the district court erred by considering acquitted conduct at sentencing, by calculating the Sentencing Guidelines range incorrectly, by refusing to allow a public authority/entrapment by estoppel defense, and by imposing a substantively unreasonable sentence. We reverse that portion of the money judgment imposed jointly and severally pursuant to 21 U.S.C. § 853 in the amount of $117,653.57 and remand for further proceedings consistent with this opinion, but affirm the convictions and sentences in all other respects.

## I. Background

In late 2013, law enforcement officers, acting in an undercover capacity, began buying products suspected of containing synthetic marijuana from smoke shops. Dirt Cheap and Island Smokes were two of the targeted shops where undercover buys occurred in 2014 and 2015. Allen Peithman first began operating Dirt Cheap in 2008. Dirt Cheap sold cigarettes, glass pipes, water pipes, t-shirts, e-cigarette products, "typical head shop stuff." When the store first opened, Peithman sold "K2", which is now referred to as "potpourri." Peithman explained to law enforcement that "K2"

did not contain any banned chemicals, did not cause consumers any problems, and was in high demand because it did not show up on drug tests. According to Peithman, "every shop in town" began selling "K2" because the product had a very high profit.

Peithman's operation of Dirt Cheap was interrupted when he was incarcerated on a federal firearm charge between March 2013 and June 2014. When Peithman was operating Dirt Cheap, he primarily relied on his wholesale suppliers to review the list of prohibited controlled substances and to insure that the "potpourri" complied with state and federal controlled substances laws. He informed law enforcement that the vendors constantly changed the products they sold to keep ahead of the evolving law. The "potpourri" sold at Dirt Cheap and Island Smokes was purchased primarily on the Internet with money orders. According to Peithman, the profit margins plummeted for "potpourri" sold during the last few years of his business. Nonetheless, on a "good day" Dirt Cheap made around five thousand dollars. On a "bad day" it would be a couple thousand dollars.

During Peithman's incarceration, Dirt Cheap was operated by Elder, although Peithman retained ownership of the name Dirt Cheap. In September 2014, Elder opened her own store, Island Smokes, because Peithman did not want to sell "potpourri" at Dirt Cheap any longer. Peithman purchased the property for the new store from his uncle and leased it to his mother. After Island Smokes opened for business, Dirt Cheap ceased selling "potpourri" but continued to sell what law enforcement consider drug paraphernalia as well as other items typically sold in smoke shops. Island Smokes sold drug paraphernalia, "potpourri," and other items typically sold in smokes shops.

Between February 2014 and August 2015, law enforcement officers conducted at least nine undercover buys. Several of the packets purchased were sent to a lab and tested positive under the United States Drug Enforcement Administration ("DEA") drug scheduling as a Schedule I controlled substance. In addition, in April 2014, law

enforcement obtained a search warrant for five boxes scheduled to be delivered to Dirt Cheap based on information from a Federal Express driver that he had become ill due to an odor coming from packages. The boxes contained approximately 2,500 various fruit-flavored packets of "K2/potpourri" in three-gram and ten-gram amounts. At that time, the packets tested negative for DEA Schedule I controlled substances.

By September of 2014, the Lincoln police department was receiving an average of 20 to 30 calls per week about people hanging around Island Smokes and trespassing at an adjacent apartment complex. Over a four-day period in April 2015, law enforcement officers responded to at least seven medical emergencies involving "potpourri" bought at Island Smokes and smoked by the purchaser. Law enforcement encountered some of the overdose victims near Island Smokes and others they visited at the hospital.

On April 23, 2015, law enforcement officers executed a search warrant at Island Smokes. One of the investigators noticed 100 pipes in a storage area behind the front counter, which in his experience were commonly used to smoke methamphetamine. When questioned, Elder called them "oil burners." When asked if Elder had aromatic oil to burn in the pipes, she located two small vials from behind the checkout counter. Elder reported to law enforcement that she generally kept 10 vials of oil per 100 pipes.

Officers seized a "K2" packet and pipe discovered while searching the back garage area, which upset Elder because she believed all the "K2/potpourri" had been removed from the store. Elder told investigators during the search of her store that even though the "potpourri" packets were labeled "do not burn," she knew a majority of her customers smoked "potpourri," purportedly to relax. She also informed the investigators that her customers had requested a milder blend because her current and recent stock was too strong and they did not like the effects.

In total, officers seized from Island Smokes more than 1,000 assorted glass pipes, bongs, gas mask pipes, dugouts, one-hitter pipes in different colors, sizes, and styles. Cigar wrappers and rolling papers were also seized. A total of 560 packets of "potpourri" were seized. Twelve sample "potpourri" packets from the inventory were sent to a lab for testing. Four of the 12 sample "potpourri" packets contained DEA Schedule I controlled substances. In addition, Food and Drug Administration ("FDA") Special Agent Bradley Cooper opined at trial that the seized "potpourri" packets were misbranded because they did not comply with FDA labeling requirements. He testified the packets were missing instructions for proper use, adequate warnings of potential adverse side effects, a list of active ingredients, a description of the contents, and the manufacturer's name.

On August 25, 2015, law enforcement officers executed a search warrant at Dirt Cheap. Glass pipes, bongs, hookahs, water pipes, scales, grinders, dugouts, one-hitters, plastic baggies, rolling papers, screens, other types of drug paraphernalia, and business records were seized. Law enforcement officers also obtained bank records for Peithman and Elder and their business accounts. An operations officer for West Gate Bank testified during the trial that multiple cash deposits in Peithman's Dirt Cheap business account would be made on a single day. For example, on December 19, 2013, a $5,000 cash deposit was made at 10:12 a.m. using teller #54; a second $4,000 cash deposit was made to the same account at 2:20 p.m. at the same branch using teller #56; and a third cash deposit of $1,292 was made 18 minutes later to the same account at the same branch using teller #58.

Between October 1, 2013, and May 11, 2015, a total of $1,100,957.65 in cash was deposited into bank accounts belonging to Peithman, Elder, Cornerstone Plaza, and AEP Properties. An expert in the field of financial investigations testified at trial about transactions indicative of structuring. He opined that the "even dollar" cash deposits made to the various accounts belonging to businesses were indicative of an intent to structure because they are inconsistent with normal business activity. He

further opined that two cash deposits made on consecutive days in an amount slightly under the $10,000 threshold daily limit might also be indicative of an intent to structure. Similarly, multiple deposits on the same day, and sometimes less than 20 minutes apart as occurred here, that totaled more than $10,000 for the day, but individually were under the $10,000 limit was indicative of structuring. The expert also testified that structuring could occur through multiple cash deposits on the same day at different banks in amounts less than $10,000 to avoid depositing more than $10,000 into any one account on a single day. According to the expert, the bank records presented at trial contained deposits indicative of structuring.

After her arrest for charges related to this case, Elder stressed to law enforcement that she, not her son, was solely responsible for the sale of "potpourri" during and after Peithman's incarceration. Both Elder and Peithman asserted at trial that Elder "went to great lengths" and used "due diligence" to make sure the products she was selling were legal. They cited, as examples, Elder's efforts to review the chemical sheets associated with the products, her discussions with the suppliers, her attendance at conferences, her consultation with a lawyer, and her decision to keep in contact with law enforcement and follow their advice, such as when she was asked to stop selling a particular product because of the serious side effects people were experiencing.

After what the district court described as "a long, and very well fought jury trial," the jury convicted Peithman, Elder, and AEP Properties on some counts and acquitted on others. The jury found Peithman and Elder guilty of conspiracy to distribute drug paraphernalia, conspiracy to commit mail fraud, investment of illicit drug profits, conspiracy to distribute misbranded drugs, and conspiracy to structure financial transactions. Peithman was sentenced to a period of incarceration of 115 months and Elder to a term of 63 months. The lengthier sentence for Peithman was due primarily to his criminal history. Both sentences were at the high end of the applicable advisory Sentencing Guidelines range as calculated by the court.

The government sought forfeiture of specific property owned by Peithman, Elder, and their companies. Both parties agreed to submit the issue of which property should be forfeited to the jury. The jury agreed that the packets of "potpourri" and related drug paraphernalia together with one bank account were subject to forfeiture. The jury was unable to reach a unanimous agreement on other specific items and found other items should not be forfeited. The items the jury did not forfeit or could not agree should be forfeited were the most valuable items of specific property.

The government also sought a money judgment as part of the forfeiture allegations pertaining to the drug paraphernalia conviction, the mail fraud conviction, and the structuring conviction. That issue was decided by the court. The government requested a money judgment in the amount of $2,248,728.56. After conducting a hearing on the issue, the court found, by a preponderance of the evidence, the appropriate money judgment was in the amount of $1,142,942.32, which "represent[ed] the wholesale costs of acquiring the drug paraphernalia and potpourri, the sale of which generated the structuring." The court specifically rejected the "proceeds theory" and was cautious to take steps to ensure double-counting did not occur. This timely appeal followed.

Peithman has raised eight issues on appeal, challenging decisions made post-trial. Elder has raised ten issues, challenging decisions made during the trial and post-trial. We have carefully considered each of their arguments and in this opinion group related claims.

## II. Discussion

*1. Peithman's 18 U.S.C. § 3147 Conviction*

18 U.S.C. § 3147 increases the punishment for an offense committed while on pretrial release. It is indisputable that the jury should not have been asked to determine Count XIV–that is, whether Peithman committed an offense under 18 U.S.C. § 3147. Years ago, this Court held that § 3147 provides for an enhancement of a sentence, not a separate offense to be found by a jury. United States v. Feldhacker, 849 F.2d 293, 299 (8th Cir. 1988). The district court acknowledged the error and took responsibility for it. The court vacated the conviction (Count XIV) before sentencing.

Peithman asked for a remedy beyond vacating the conviction. He moved for a new trial, arguing the entire trial was tainted by permitting evidence of his prior conviction and conditions of supervised release because Count XIV was submitted to the jury. The court denied the new trial motion on the ground that the interviews Peithman and Elder provided to law enforcement would have been admitted into evidence regardless of Count XIV and no "conceivable prejudice" could exist since there were 18 references during Peithman's interview and five references during Elder's interview to the fact that Peithman had been in prison, was on supervised release, and was staying out to the smoke shop business to avoid trouble with his probation officer.

During the new trial motion and now on appeal, the parties characterize Peithman's defense theory as one in which Peithman was not involved in unlawful activity during the times alleged in the indictment because he was in jail during a majority of that time and that following his release he consciously avoided the business due to his supervised release conditions. Peithman argues on appeal that he is entitled to a new trial because this defense was thrust upon him when the government wrongfully charged him under 18 U.S.C. § 3147 and then compounded the error by introducing evidence that: (1) he had an unidentified prior federal conviction; (2) he was placed in the "high risk" supervised release case load; and (3)

he was on supervision for three years and had to comply with identified terms and conditions during the time of supervision.

We have reviewed the trial transcript. The defense arguments for acquittal advanced during the trial are remarkably different than what has been portrayed on appeal. The prosecutor made the following assertions during her opening statement: Peithman initially ran Dirt Cheap and then was "gone for a while;" while he was gone, Peithman had given a power of attorney to Elder to run the store; and in the summer of 2014, Peithman went " back to work" at Dirt Cheap while on "what's called supervised release from a prior matter."

Peithman's attorney also mentioned during his opening statement Peithman's absence from the business. Counsel explained to the jury:

> And when this indictment happened in 2013, all the way up until June of 2014, he wasn't even around. Now, he had started Dirt Cheap back in 2008 and ran it for a while until he left the state. So for the first part of this indictment, which on Count I starts from October 1st, 2013, and goes through April 23rd of 2015, Allen Peithman, AJ, as many of his friends call him, wasn't even around for most of that. He had nothing to do with the business. Dirt Cheap was still -- was still going, operated by his mother, but he had nothing to do with the day-to-day operations.

It was at this point that Peithman's theory of defense diverged from the prosecutor's theory. Peithman contended he was not guilty because he changed occupations. According to defense counsel, Peithman shifted from being a business owner to being a landlord. Counsel clearly laid out Peithman's intentions to the jury:

> AJ was going to get away from the head shop, and he was going to start investing in real estate. He was going to be a landlord.

-11-

The shop at Dirt Cheap, he was a landlord. He collected rent from Dirt Cheap. He collected rent from Island Smokes. Every now -- His mom ran the business, Shari. Every now and then, she'd need a favor from him, he is her son, to open the door sometimes when she couldn't make it down to Dirt Cheap. Would he take the cash that she'd made that day and drop it in the bank? Yes.

But AJ was not in some type of agreement or conspiracy with his mother. He was a landlord and he was a son, and that's the evidence that you are going to hear.

During closing argument, Peithman's counsel reiterated comments he made during his opening statement. Peithman argued to the jury that he was being singled out because of his family's wealth. Counsel reiterated several times during his closing argument that Peithman was not in the smoke shop business; rather, he was a landlord. Counsel argued, in particular:

> The whole thing was a game of gotcha. Follow the money. It's a game of gotcha because the Government wants their money. They want the Elder money. They could have shut this down at any time. They could have walked in there -- They had a positive lab for synthetic marijuana, I believe Officer Reynolds said, in summer of 2014, and they sat on it, because this case was bigger than this public health crisis that they now claim existed.
>
> * * *
>
> AJ gets out of prison. His mom has taken over the business. She buys him a property, like a mom might do who has money. She had, essentially, bought the business for him, so it's not odd that she bought the building and he was going to be the landlord. That doesn't make him part of the business.
>
> Look, AJ had money. AJ was wealthy. He had that cash. He had those coins. He was making his own way.

Counsel's defense theory and arguments advanced to the jury had little to do with Peithman's prison stay or supervised release conditions. He argued this case was a "smoke-filled prosecution." He argued it was a case of "gotcha." Counsel argued that the Peithman/Elder family had been targeted because of their wealth. He argued Elder was innocent of the charges because she acted in good faith and did everything she could to ensure the products she was selling were legal. Counsel argued Peithman was out of the smoke shop business during the time frame alleged in the indictment because he was a landlord. He was in the business of buying and leasing real estate. A review of the trial transcript demonstrates that Peithman was not forced to, and he did not, embrace a defense focused on the period of incarceration and conditions of supervised release because Count XIV was submitted to the jury.

Motions for a new trial are warranted only when "a serious miscarriage of justice may have occurred." United States v. Braden, 844 F.3d 794, 801 (8th Cir. 2016) (quoting United States v. Fetters, 698 F.3d 653, 656 (8th Cir. 2012)). An evidentiary error is harmless if it did not substantially influence the jury's verdict. United States v. Aldridge, 664 F.3d 705, 714 (8th Cir. 2011) (quoting United States v. Henderson, 613 F.3d 1177, 1183 (8th Cir. 2010)). "Error may be harmless where 'the government introduced ample competent evidence from which the jury could conclude beyond a reasonable doubt that the defendant was guilty even without the evidence that should have been excluded.'" United States v. Cotton, 823 F.3d 430, 435 (8th Cir. 2016) (quoting Aldridge, 664 F.3d at 714).

The error in submitting to the jury a statutory sentencing enhancement is not one we consider lightly. On this record, however, the error was harmless. Both Peithman and Elder discussed Peithman's incarceration and supervised release status during their interview with law enforcement officers. Even if Count XIV had not existed, the court indicated it would have allowed those statements to be introduced at trial. Peithman has not persuaded us that he likely would have been successful in

limiting the statements at issue in the absence of Count XIV. Regardless of Count XIV, an explanation of Peithman's absence from the smoke shop business during a portion of the relevant time period would have been before the jury. More importantly and contrary to Peithman's argument, inclusion of evidence regarding Peithman's prior conviction, period of incarceration, and conditions while on supervised release did not force upon him a defense strategy that he did not select. In fact, he chose a different strategy, which in the end did not persuade the jury. The district court did not abuse its discretion by denying Peithman's motion for a new trial.

## 2.  *Public Authority/Entrapment by Estoppel Defense*

Elder argues the district court erred by refusing to allow her to present a public authority/entrapment by estoppel defense. We review the refusal to permit an affirmative defense *de novo* because it is question of law. United States v. Carlson, 810 F.3d 544, 554 (8th Cir. 2016).

Elder sought to present a public authority or entrapment by estoppel defense on the ground that, after the inventory was seized during execution of the search warrant, the city attorney provided her with a community protection agreement. The agreement requested Elder to voluntarily "cease and desist" selling "potpourri" and it set a signing deadline of May 15, 2015. The letter warned Elder that if she did not voluntarily sign the agreement, the city would take "legal action in the very near future." In seeking to present these affirmative defenses, Elder also relied on what she described as a "close working relationship with law enforcement" with regard to what substances were legal or illegal as well as an unnamed police officer who she alleged told her it was legal to sell synthetic cannabinoids in Lincoln.

A "public authority defense requires a defendant to show that [s]he was engaged by a government official to participate in a covert activity." United States v. Parker, 267 F.3d 839, 843 (8th Cir. 2001) (citing United States v. Achter, 52 F.3d

-14-

753, 755 (8th Cir. 1995)). There is no evidence that Elder relied on the authority of a government official when operating the smoke shops at issue, nor is there evidence that a federal law enforcement officer asked her to act in a manner in violation of federal law. The district court properly declined to instruct the jury on the defense of public authority.

"Entrapment by estoppel arises when a government official tells a defendant that certain conduct is legal, and the defendant commits what otherwise would be a crime in reasonable reliance on the official representation." Parker, 267 F.3d at 844 (citing United States v. Benning, 248 F.3d 772, 775 (8th Cir. 2001)). In the letter to Elder, the city attorney never told Elder her conduct was legal. The city made no promises regarding criminal prosecutions and specifically explained to Elder that an agreement by the city not to take legal action against the businesses selling "potpourri," such as declaring them public nuisances, was not binding on federal, state, or local prosecuting authorities. Elder has not shown a representation made by the city was misleading, let alone intentionally misleading. In addition, Elder cannot show reliance, particularly when the city attorney's statements were made after execution of the search warrant.

Elder's willingness to sign a community protection agreement, after contraband had been seized, is not evidence that a government official told Elder that her conduct was legal. Likewise, Elder's willingness to work with law enforcement by removing particularly potent "potpourri" packets for sale because consumers were overdosing and some almost died is not evidence that a government official told Elder the products were legal to sell. The district court properly declined to instruct the jury on the defense of entrapment by estoppel.

3.     *Sufficiency of the Evidence*

-15-

Peithman argues the evidence was insufficient to support the existence of a conspiracy or to prove the conviction for investment of illicit drug profits. Elder argues the evidence was insufficient to support the sale of misbranded drugs and the existence of structuring of bank deposits.

"We review challenges to the sufficiency of the evidence de novo." United States v. Johnson, 745 F.3d 866, 868–69 (8th Cir. 2014) (citing United States v. Sullivan, 714 F.3d 1104, 1107 (8th Cir. 2013)). The evidence is to be viewed "in the light most favorable to the guilty verdict, granting all reasonable inferences that are supported by that evidence." Id. at 869. In our review, we do not weigh the evidence or the credibility of the witnesses. United States v. Wiest, 596 F.3d 906, 910 (8th Cir. 2010) (citing United States v. Honarvar, 477 F.3d 999, 1000 (8th Cir. 2007)). "We will reverse a conviction only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." Johnson, 745 F.3d at 869.

Sufficient evidence was presented to sustain a jury finding that Peithman was more than "merely associated with" Elder. Peithman and Elder ordered "potpourri" and drug paraphernalia from out-of-state suppliers. The products were shipped to Dirt Cheap and Island Smokes using interstate common carriers such as FedEx and UPS. Typically, payments for the shipments were made with money orders and/or cashier's checks. Peithman and Elder attempted to disguise the amounts and cash proceeds from the sale of illegal products by making cash deposits using different tellers, different branches of the same bank, different accounts, different banks, and by purchasing money orders at multiple agents to avoid the filing of currency transaction reports for deposits exceeding the $10,000 threshold as provided in 31 U.S.C. § 5313.

Store employees testified about their knowledge and understanding of Peithman's involvement in the businesses. It was clear that Peithman and Elder

-16-

communicated regularly about the businesses' operation. Peithman accepted rent payments from Elder for Dirt Cheap and Island Smokes. Proceeds from the sale of drug paraphernalia and misbranded drugs were used to purchase the building and real property where Island Smokes was located. Additional real estate and vehicles were also purchased with money obtained through the sale of drug paraphernalia and misbranded drugs. Peithman and Elder had knowledge that the "potpourri" being sold at Island Smokes and Dirt Cheap was being smoked by consumers. There was evidence presented at trial by way of expert testimony that the "potpourri" failed to comply with FDA labeling requirements.

The evidence overwhelmingly established the existence of a conspiracy, that illicit drug profits were used to purchase real and personal property, the sale of misbranded drugs occurred during the time period alleged in the indictment, and structuring took place to disguise the proceeds being realized from the sale of unlawful controlled substances and drug paraphernalia. Neither Peithman nor Elder have presented a sufficient reason to disturb the jury's findings.

### 4.    *Request to Remove Sick Juror*

Peithman argues the district court abused its discretion by refusing to substitute an alternate juror in place of a temporarily sick juror. See United States v. Blom, 242 F.3d 799, 805 (8th Cir. 2001) (noting "most rulings on juror challenges are reviewed on appeal for abuse of discretion). Juror No. 4 announced on the afternoon of the fourth day of trial that she was tired and unable to concentrate. She had been taking medication for mononucleosis and was so tired in the evenings that she could not work as a Mary Kay consultant. The court recessed the trial for the day to allow the juror to rest. On the next morning, the juror indicated she was feeling better. The judge asked the following question, which was approved by the lawyers: "If you were to remain as a juror, are you confident or not confident that you will be able to render

a thoughtful and attentive decision?"  The juror responded: "I'm confident that I would be."

In light of the juror's representation that she would be able to be attentive for the remainder of the trial and the lack of any indication the juror was unable to understand or appreciate the evidence that had been presented before she informed the court of her exhaustion, the district court did not abuse its discretion in denying the motion to strike the juror and replace her with an alternate.

### 5.    *Money Judgment*

The indictment sought forfeiture under 31 U.S.C. § 5317(c); 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1); and 28 U.S.C. § 2461(c) of all real and personal property upon conviction of an offense listed in Counts XI through XIII.  Peithman and Elder each were convicted on Counts XI (conspiracy to commit mail fraud) and XII (conspiracy to structure financial transactions).  The indictment also sought forfeiture under 21 U.S.C. § 853(a) of specified real property; vehicles; bank accounts; and controlled substances, drug paraphernalia, and/or misbranded drugs upon conviction of a controlled substance  offense listed in Counts I through IX.  Peithman and Elder each were convicted of Count VIII (conspiracy to distribute and possess with intent to distribute drug paraphernalia).  The government further sought a money judgment as part of the forfeiture allegations for the convictions related to the sale of drug paraphernalia, mail fraud, and structuring.

The court imposed a money judgment in the total amount of $1,142,942.32 plus interest as provided by law.  This amount consisted of the costs to purchase drug paraphernalia, which the court found totaled $117,653.57, plus the costs to purchase "potpourri" related to the mail fraud conviction, which the court found totaled $1,025,288.75.

Peithman and Elder have not challenged the government's asserted statutory bases for forfeiture. Rather, they argue the money judgment imposed jointly and severally against them (and their companies) should be vacated because it is inconsistent with the jury's decision not to forfeit most of their property and contrary to the Supreme Court's decision in Honeycutt v. United States, 137 S. Ct. 1626 (2017). "[W]e review the district court's factual findings for clear error but apply a de novo standard of review to [the issue] of whether or not those facts render the [asset] subject to forfeiture." United States v. Dodge Caravan Grand SE/Sport Van, VIN No. 1B4GP44G2YB7884560, 387 F.3d 758, 761 (8th Cir. 2004) (citing United States v. $84,615 in U.S. Currency, 379 F.3d 496, 501 (8th Cir. 2004)). "If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1)(A). "The court may make the determination based on evidence in the record, or on additional evidence submitted by the defendant or evidence submitted by the government in support of the motion for the entry of a judgment of forfeiture." Fed. R. Crim. P. 32.2 advisory committee's notes to the 2000 amendments. The government bears the burden of proving by a preponderance of the evidence the amount of the proceeds that should be subject to a personal money judgment. United States v. Bieri, 21 F.3d 819, 822 (8th Cir. 1994).

When reviewing money judgments, we have explained: "[T]he law does not demand mathematical exactitude in calculating the proceeds subject to forfeiture." United States v. Prather, 456 F. App'x 622, 626 (8th Cir. 2012) (quoting United States v. Roberts, 660 F.3d 149, 166 (2d Cir. 2011)). "Rather, district courts may use general points of reference as a starting point for a forfeiture calculation and make reasonable extrapolations supported by a preponderance of the evidence." Id.

21 U.S.C. § 853 provides that a defendant convicted of an enumerated controlled substance offense "shall forfeit to the United States . . . any property

-19-

constituting, or derived from, any proceeds the person obtained, directly or indirectly, as a result of such violation." In Honeycutt v. United States, the Supreme Court held that forfeiture of property under § 853 is limited to property the defendant himself actually acquired as a result of the crime, and further held that joint and several liability was not appropriate for co-conspirators. 137 S. Ct. at 1632–33. In Honeycutt, the Court declined to hold a co-conspirator responsible for the entire forfeiture judgment when he only managed the sales and inventory, had no ownership interest, and never obtained tainted property. Here, both Peithman and Elder had ownership interests, worked together to operate the businesses, and shared in the proceeds obtained by engaging in criminal activity. While we find no clear error in the court's determination that Peithman and Elder were equally culpable, Honeycutt precludes the district court from imposing joint and several liability for co-conspirators under § 853. We reverse that portion of the money judgment ($117,653.57) imposed jointly and severally under § 853 relating to the conviction for conspiracy to distribute drug paraphernalia, and remand for proceedings consistent with this opinion.

The bulk of the total money judgment imposed related to the conviction for conspiracy to commit mail fraud regarding misbranded drugs (the "potpourri"). Section 981(a)(1)(C) provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense." 18 U.S.C. § 981(a)(1)(C). "Mail fraud is a 'specified unlawful activity.'" United States v. Adetiloye, 716 F.3d 1030, 1041 (8th Cir. 2013) (citing 18 U.S.C. § 1956(c)(7)).

We note a circuit split has developed on the question of whether Honeycutt applies to criminal forfeitures under § 981(a)(1)(C). Compare United States v. Sexton, 894 F.3d 787, 798–99 (6th Cir. 2018) (holding that Honeycutt does not apply

to forfeiture under 18 U.S.C. § 981(a)(1)(C)), with United States v. Gjeli, 867 F.3d 418, 427 (3d Cir. 2017) (finding that 18 U.S.C. § 981(a)(1)(C) is substantially the same as the [statute] under consideration in Honeycutt"), and United States v. Carlyle, 712 F. App'x 862, 864–65 (11th Cir. 2017) (per curiam) (remanding to the district court for a determination on whether Honeycutt governed wire fraud forfeiture under § 981(a)(1)(C) and observing it appeared likely to apply). A review of the text and structure of the two statutes reveals similarities and also notable differences. Unlike in 21 U.S.C. § 853, the term "proceeds" is defined in 18 U.S.C. § 981(a)(1)(C). And it is broadly defined in three different ways. Section 981(a)(2) provides distinct definitions for three categories of offenses. As relevant in this case, § 981(a)(2)(A) defines proceeds as "property of any kind obtained directly or indirectly, as a result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." The two statutes being compared are similar in a sense that they both use the verb "obtained," which the Supreme Court placed great emphasis on when it limited forfeiture to personal liability. It is also notable that the requirement that property be "traceable" to the commission of the offense as contained in § 981(a)(2)(A) is similar to § 853's requirement that the property be "tainted," as described in Honeycutt.

Turning to the differences between the statutes, a material distinction is the lack of a reference to a "person" in § 981. See Sexton, 894 F.3d at 799 (describing the phrase "the person obtained" as the "linchpin" of the Honeycutt decision). In contrast, § 853 applies to property "the person obtained, directly or indirectly, as the result of" the crime. The Supreme Court noted that § 853(a) "define[d] forfeitable property solely in terms of personal possession or use." 137 S. Ct. at 1632.

The plain language under § 981 is broader than § 853 and less focused on personal possession. As set forth in § 981(a)(2)(A), property is subject to forfeiture if it is "traceable" to the crime. The statute does not contain any language that

requires possession of the property by the defendant, either explicitly or implicitly. We think these differences are significant. We join the Sixth Circuit and conclude that the reasoning of <u>Honeycutt</u> is not applicable to forfeitures under 18 U.S.C. § 981(a)(1)(C) and hold the district court did not err when imposing joint and several liability as to this portion of the money judgment.

When determining the amount of the money judgment, the district court reasoned that by concentrating on the wholesale costs, the money judgment would be proportional to the gravity of Peithman's and Elder's offenses. We find no clear error in the district court's decision to use the cost of acquiring the "potpourri," nor in its calculation of the appropriate amount which flowed from the conspiracy to commit mail fraud as to the sale of misbranded drugs. <u>See</u> <u>Prather</u>, 456 F. App'x at 625 (affirming court's imposition of a $41,600 money judgment based on the defendant's statement that he sold crack cocaine for 52 weeks and profited in the amount of $800 per week). The fact that the jury did not forfeit Peithman's real property, vehicles, or bank accounts does not render the court's determination in error. Likewise, the fact that the jury forfeited one of Elder's bank accounts and found her corporation, Cornerstone Plaza, guilty of five counts does not render imposition of joint and several liability under 18 U.S.C. § 981(a)(1)(C) in error. We affirm the district court's imposition of a joint and several money judgment under § 981(a)(1)(C) in the amount of $1,025,288.75.

6. *Sentencing Guidelines Calculations and Reasonableness of Sentences*

We review a district court's factual findings pertaining to the calculation of the applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range for clear error and its application of the Guidelines *de novo*. <u>United States v. Hairy Chin</u>, 850 F.3d 398, 402 (8th Cir. 2017) (quoting <u>United States v. Barker</u>, 556 F.3d

682, 689 (8th Cir. 2009)).  If we find no error, we review the sentence for substantive reasonableness.  Id.

Both Peithman and Elder were sentenced within the Guidelines range as calculated by the district court.  A sentence within the Guidelines range is presumptively reasonable.  United States v. Washington, 893 F.3d 1076, 1080 (8th Cir. 2018) (quoting United States v. Meadows, 866 F.3d 913, 920 (8th Cir. 2017)). We review a district court's refusal to grant a defendant's requested downward variance for abuse of discretion.  United States v. Jackson, 852 F.3d 764, 777 (8th Cir. 2017).  Likewise, we review the substantive reasonableness of a sentence under the deferential abuse-of-discretion standard.  United States v. Feemster, 572 F.3d 455, 461 (8th Cir. 2009) (quoting Gall v. United States, 552 U.S. 38, 51 (2007)).  "A district court abuses its discretion when it '(1) fails to consider a relevant factor that should have received significant weight'; (2) 'gives significant weight to an improper or irrelevant factor'; or (3) 'considers only the appropriate factors but in weighing those factors commits a clear error of judgment.'"  Id. (quoting United States v. Kane, 552 F.3d 748, 752 (8th Cir. 2009)).

### A.    Allen Peithman, Jr.'s Sentence

Peithman argues the district court miscalculated his Guidelines range, erred in failing to consider U.S.S.G. § 5G1.3(b), and abused its discretion by refusing to grant a more substantial downward variance.  The court determined Peithman's base offense level was  24.  The court applied a two-level enhancement under U.S.S.G. § 2D1.1(b)(12) for maintaining a premises for the purpose of distributing a controlled substance.  The court also applied a two-level increase for obstruction of justice because Peithman hid assets for the purpose of avoiding forfeiture.  The concealed assets included "hundreds of thousands of dollars" and gold and silver.

After the increases, Peithman's total offense level was 28. With eight criminal history points, Peithman was in criminal history category IV. These determinations resulted in an advisory Guidelines sentencing range of 110 to 137 months. The court contemplated a sentence below the advisory Guidelines range for two reasons: (1) reluctance to rely on acquitted conduct; and (2) the manner in which the Guidelines convert "potpourri" to a marijuana equivalent. The Guidelines utilize a ratio of 1 gram of synthetic controlled substance to 167 grams of marijuana. The court noted its "dissatisfaction" with that ratio.

The court varied downward two levels, which produced an advisory Guidelines sentencing range of 92 to 115 months. Peithman was sentenced to concurrent 115 month terms of imprisonment on Counts IX, XI, and XII. The court imposed concurrent sentences of 36 months on Counts VIII and X–offenses that carried a statutory maximum imprisonment term of 36 months.

Peithman asserts the court erred when it applied an enhancement under § 2D1.1(b)(12) because the enhancement only applies to controlled substance offenses, not paraphernalia offenses, and it improperly included acquitted conduct. We disagree.

The Guidelines explain that "[m]anufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises." U.S.S.G. § 2D1.1 cmt. n.17. The evidence presented at trial established Peithman maintained a business with the sale of "potpourri" as a primary use. According to Peithman's own admissions, "potpourri" was in high demand and was more profitable than other items sold at the store.

Peithman's second assertion pertaining to consideration of acquitted conduct is foreclosed by our precedent. "Whether or not the district court relied on acquitted conduct, '[i]t is settled in this circuit ... that the Constitution does not preclude a district court from considering acquitted conduct in sentencing a criminal defendant.'" United States v. Roberts, 881 F.3d 1049, 1053 (8th Cir. 2018) (quoting United States v. Papakee, 573 F.3d 569, 576 (8th Cir. 2009)). The district court did not err in applying the enhancement under U.S.S.G. § 2D1.1(b)(12).

Peithman also argues the district court erred by applying an obstruction of justice enhancement under U.S.S.G. § 3C1.1. The court found Peithman had lied to pretrial services when he failed to disclose money located in a safe. During the forfeiture portion of the trial, Peithman admitted he failed to report all assets to his pretrial services officer in an attempt to keep the assets from being taken. Application note 4(H) to § 3C1.1 states the enhancement applies to conduct that involves "providing materially false information to a probation officer in respect to a presentence or other investigation for the court." Based on Peithman's own admission, the district court did not clearly error in applying a two-level increase for obstruction of justice.

Peithman next claims the district court erred by refusing to give him a two-level downward adjustment for being a minor participant. Peithman was not a minor participant in the offenses. The evidence in the record supports the district court's finding that Peithman was as culpable as Elder. There was sufficient evidence for a jury to find Peithman understood the scope and structure of the criminal activity and participated in it. Peithman was ineligible for a minor-role adjustment.

Peithman next argues the district court erred in cross-referencing the controlled substance table. U.S.S.G. § 2D1.7 is entitled "Unlawful Sale or Transportation of Drug Paraphernalia; Attempt or Conspiracy." Subsection (b) of § 2D1.7 provides for a cross-reference if the offense involved a controlled substance. Peithman was involved in the sale of misbranded drugs that tested positive for a DEA Schedule I controlled substance. The cross-reference plainly applied.

Peithman's last claim of error regarding the Guidelines calculation pertains to the structuring conviction. Peithman contends the amount that should have been attributed to him is less than $550,000 due to the period of time he was incarcerated. The structuring conviction played no role in sentencing Peithman because it was grouped with the other convictions. When offenses are grouped, the Guidelines range that produces the highest offense level is used. U.S.S.G. § 3D1.3(b). In this case, it was the conviction for possession and distribution of drug paraphernalia that produced the highest offense level relied on by the court at sentencing. Finding no calculation error for that conviction, any error with regard to the structuring conviction is harmless.

Peithman argues in the alternative that if the district court calculated the Guidelines range correctly, the district court erred by not granting a more substantial downward variance. Peithman asserts the variance the district court granted "was more form over substance" since the sentence fell within the original Guidelines range of 110 to 137 months. We find the district court acted within its discretion when it varied downward and then imposed a sentence within the reduced Guidelines range that happened to also be within the initial Guidelines range.

Finally, Peithman argues the court's decision to impose a consecutive sentence on the revocation matter was in error under U.S.S.G. § 5G1.3(b). The district court

also found it was not going to account for the six month state probation revocation sentence because "they're two separate crimes."  U.S.S.G. § 7B1.3(f) states:

> Any term of imprisonment imposed upon the revocation of . . . supervised release shall be ordered to be served consecutively to any sentence of imprisonment that the defendant is serving, whether or not the sentence of imprisonment being served resulted from the conduct that is the basis of the revocation of probation or supervised release.

Section 5G1.3(b) gives the court the authority to adjust a sentence if the court determines a period of imprisonment served on an undischarged imprisonment term will not be credited by the Bureau of Prisons and the sentence for the instant offense is ordered to run concurrently to the remainder of the undischarged term of imprisonment.  "[S]ection 5G1.3(b)(2) does not prohibit the district court from exercising its statutory authority to impose a consecutive sentence." United States v. Benson, 888 F.3d 1017, 1019 (8th Cir. 2018) (citing United States v. Martinez Rodriguez, 508 F. App'x 573, 575 (8th Cir. 2013)).  The district court did not err when it imposed a consecutive sentence on the federal revocation case.  Further, the district court acted within its discretion when it declined to account for the six month state sentence because it found they were separate crimes.  See United States v. Mathis, 451 F.3d 939, 941 (8th Cir. 2006) (noting the district court's wide discretion to run a federal sentence consecutive to an undischarged state offense).

Upon our careful review of the record, we find no error in the calculation of the Guidelines range in Peithman's case.  The district court did not abuse its discretion when it imposed the sentences it did.

## B. Sharon Elder's Sentence

Elder argues the district court erred when it based its sentence upon acquitted conduct, in determining the applicable base offense level, in failing to depart or vary from the Guidelines, and in imposing a substantively unreasonable sentence. The district court found Elder's base offense level was 24, using the cross-reference to U.S.S.G. § 2D1.1(a)(5) and the drug quantity table. Like Peithman, the court applied a two-level enhancement under U.S.S.G. § 2D1.1(b)(12) for maintaining a premises for the purpose of distributing a controlled substance. A total offense level of 26 and criminal history category I resulted in an advisory Guidelines sentencing range of 63 to 78 months. The court treated Elder similarly to Peithman and varied two-levels downward for the same reasons it did in Peithman's case, as discussed in the previous subsection. Elder's advisory Guidelines sentencing range was 51 to 63 months. Elder was sentenced to concurrent 63 month terms of imprisonment on Counts IX, XI, and XII and concurrent 36 months terms on Counts VIII and X–offenses that carried a statutory maximum imprisonment term of 36 months.

For the same reasons that applied in Peithman's case, as discussed in the previous subsection, Elder's challenges to the cross-reference and use of the drug quantity table are without merit. Although the jury acquitted Elder of the substantive offenses for distribution of controlled substances, the court may rely on acquitted conduct at sentencing. Roberts, 881 F.3d at 1053. The evidence presented at trial established that the primary sale of goods at Island Smokes was the sale of "potpourri." The court properly applied § 2D1.1(b)(12).

Elder's within-Guidelines range sentence is presumptively reasonable. Washington, 893 F.3d at 1080. We find no error by the district court in calculating the Guidelines or applying the Guidelines in Elder's case. We find the district court did not abuse its discretion when it refused to grant a more substantial downward

variance or a downward departure. Elder suggests her sentence is substantively unreasonable, but she cannot point to anything in particular to rebut the presumption of reasonableness to a within-Guidelines-range sentence like this one. Her age, alleged poor health, hardship caused by incarceration, and conduct giving rise to the convictions were all considerations brought to the district court's attention. The district court did not err or abuse its discretion when sentencing Elder.

## III.    Conclusion

For the foregoing reasons, we reverse the money judgment imposed jointly and severally under 21 U.S.C. § 853 in the amount of $117,653.57 and remand for further proceedings consistent with this opinion, but affirm the convictions and sentences in all other respects.

_____