NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0016n.06
Nos. 18-6055/6218/6242

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,       )
                                  )

    Plaintiff-Appellee,         )

                                  )

v.                                )   ON APPEAL FROM THE

                                )   UNITED STATES DISTRICT

CIRO MACIAS MARTINEZ, SMIRNA ORTIZ, )   COURT FOR THE EASTERN

and RENE RAMOS CAMPOS,          )   DISTRICT OF KENTUCKY

                                )

    Defendants-Appellants.      )

---

**FILED**
Jan 13, 2020
DEBORAH S. HUNT, Clerk

---

Before: SUTTON, KETHLEDGE, and STRANCH, Circuit Judges.

KETHLEDGE, Circuit Judge. Ciro Macias Martinez, Rene Ramos Campos, and Smirna Ortiz appeal their convictions and sentences in connection with a drug and money-laundering conspiracy. We reject all their arguments and affirm.

I.

In 2015, a farmhand named Ciro Macias Martinez began laundering Mexican drug-cartel money for a man known as "Jalisco," whom Macias had met in prison. At first Macias wired small amounts of money to Mexico—$3,000 or less. He eventually gained the cartel's trust and began laundering larger amounts. To do so, he enlisted the help of his wife, Brizeida Sosa, who in turn asked her sister, Arlenne, and a coworker, Laura, to participate. Laura then recruited her own sister, Smirna Ortiz.

To begin the laundering process, Jalisco would send account numbers and directions to Macias, who would pick up the drug money. Macias or Sosa would then divide the money (sometimes hundreds of thousands of dollars) into stacks that each totaled less than $10,000. Then Sosa, Arlenne, Laura, and Ortiz (or some combination of that group) would travel to banks in Kentucky, Tennessee, or North Carolina to deposit each stack separately, using the account numbers provided by Macias. The women would make deposits at multiple banks per trip, and later sent photos of the deposit slips to Macias, who sent them on to Jalisco. For every $10,000 in structured deposits, the women received $200.

Macias also shipped cash in bulk for the cartel. At Jalisco's direction, Macias would contact a courier, specify a meeting time and place, and deliver money for the courier to smuggle into Mexico. To that end, in November 2016, Macias met Rene Ramos Campos at a gas station and handed him a duffel bag with $575,440. Campos then hid the money in two compartments in the cab of his tractor trailer and drove off. Soon thereafter, an "interdiction team" stopped Campos and seized the cash, which Campos admitted was drug money.

Macias also distributed methamphetamine and other drugs for the cartel. Jalisco's couriers would deliver drugs to Macias, who passed them on to street-level dealers. Macias would decide whether the dealers paid for the drugs up front or after they sold the drugs. Then Macias would launder the proceeds. Eventually Macias was distributing 40 kilograms of drugs per week.

In April 2017, DEA agents arrested Macias and Ortiz, among others. Their cases were later consolidated with Campos's case. Macias thereafter pled guilty to conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846, and conspiracy to commit money laundering with the intent to promote a specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and 1956(h). Campos also pled guilty to conspiracy to commit money

laundering to promote a specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and 1956(h). Ortiz went to trial, where a jury convicted her of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(ii) and 1956(h).

Macias's guidelines range was 324 to 405 months' incarceration; the district court sentenced him to 372 months. Campos's range was 121 to 151 months; the district court sentenced him to 136 months. Ortiz's range was 97 months to 121 months; the district court sentenced her to 97 months.

These appeals followed.

## II.

## A.

Macias appeals only his sentence, specifically the district court's application of a four-level enhancement for what the court found to be Macias's leadership role in the conspiracy. *See generally* U.S.S.G. § 3B1.1. We review that finding for clear error, and otherwise review deferentially the court's legal conclusion that Macias was an organizer or leader. *See United States v. Sexton*, 894 F.3d 787, 794 (6th Cir. 2018).

As described above, Macias was the hub of conspiracies to sell drugs and to launder the proceeds of those sales. Macias received drugs from the cartel, passed the drugs on to street-level dealers, and dictated the terms on which the dealers paid for the drugs. Macias also recruited participants in the money-laundering conspiracy and directed the conspiracy's operations, based in part on Jalisco's instructions to Macias. Plainly he played a leadership role in the conspiracies here.

Macias is mistaken, moreover, to argue that Jalisco's instructions to him, or Sosa's instructions to her co-conspirators, precluded a finding that Macias was a leader or organizer. A

conspiracy can have multiple leaders or organizers, *see* U.S.S.G. § 3B.1.1 cmt. n.4; and that Macias had participants above him (Jalisco) and beneath him (Sosa) does nothing to diminish the leadership role that he in fact played in these conspiracies. The district court had ample grounds for the enhancement.

B.

Campos likewise challenges only his sentence, specifically the district court's refusal to reduce Campos's offense level based on what Campos says was his acceptance of responsibility for his offense. *See generally* U.S.S.G. § 3E1.1. The district court initially granted that reduction, but revoked it during Campos's sentencing hearing. There, Campos's attorney argued that Campos had laundered only $275,000—rather than the $575,440 that agents seized from his truck—because, Campos asserted, he planned to steal about $300,000 of that amount rather than pass it on to the cartel. The district court thought that assertion was factually frivolous—stealing $300,000 from a drug cartel usually leads to consequences not worth the $300,000—and that the assertion amounted to a denial in substantial part of the money-laundering conduct to which Campos had pled. Hence the court revoked the reduction.

Whether we review the district court's revocation of the § 3E1.1 reduction deferentially or de novo is less than clear. *United States v. Thomas*, 933 F.3d 605, 611 (6th Cir. 2019) (collecting cases). But that difference in the standard does not make any difference to the outcome here. "A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility[.]" U.S.S.G. § 3E1.1 cmt. n.1(A). Here, Campos pled guilty to conspiring to launder money, in violation of 18 U.S.C. 1956(a)(1)(A)(i) and 1956(h). The value of the money he laundered is "relevant conduct" under the Sentencing Guidelines. *See* U.S.S.G. § 1B1.3, 2S1.1(a)(2)–(b)(1), 2B1.1(b). Campos

substantially denied that relevant conduct when he asserted at his sentencing hearing that he intended to launder only $275,000. To a significant extent, therefore, Campos sought to evade responsibility for the very conduct to which he pled guilty. And he did so on grounds that the district court emphatically found to be false. Admittedly, we have our doubts that Campos's assertion that he intended to steal the $300,000 was "frivolous," given that Campos had hidden that amount separately from the other $275,000 in the cab of his truck. But we see no basis to set aside the court's more modest conclusion that Campos's assertion was simply false.

Moreover, Campos is mistaken to argue that the district court revoked the acceptance-of-responsibility reduction solely on the basis of a "legal argument" made by his counsel. That legal argument, as shown above, was based upon a factual premise that itself amounted to a substantial denial (rather than acceptance) of responsibility. And Campos himself vouched for that factual premise when the district court pressed him on the point. Thus, in sum, the court did not err when it found that Campos was not entitled to an offense-level reduction under § 3E1.1.

Campos separately challenges the district court's finding that Campos was engaged "in the business of money laundering." *See generally* U.S.S.G. § 2S1.1(b)(2)(C). We review that finding for clear error. *See United States v. Anderson*, 526 F.3d 319, 323 (6th Cir. 2008). There was none: Campos admitted that he typically received $10,000–$15,000 for transporting drug proceeds and that agents had seized $400,000 from him in similar circumstances in 2013; and Campos was a passenger in another vehicle stop during which officers seized $140,000. Campos's argument is meritless.

C.

Ortiz appeals both her conviction and her sentence. She first argues that the government lacked sufficient evidence to convict her. We must affirm her conviction if, based on the evidence

at trial, any rational jury could find that she conspired to launder money in violation of 18 U.S.C. § 1956(a)(1)(B)(ii). *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Ortiz challenges the government's proof as to two elements in particular: first, that she knew the money that she and her co-conspirators deposited was drug proceeds; and second, that she knew the deposits were structured (by keeping them below $10,000) "to avoid a transaction reporting requirement under State or Federal law." 18 U.S.C. § 1956(a)(1)(B)(ii).

That the money that Ortiz and others deposited was the proceeds of unlawful activity should have been obvious to any sentient member of the conspiracy. Macias was employed at a horse farm and his wife, Sosa, was a waitress; yet at Macias's direction Ortiz and her co-conspirators deposited more than a half-million dollars in cash (which typically smelled like marijuana) before they were arrested. Ortiz also saw Sosa count into separate piles as much as $250,000 in cash on a single occasion. Moreover, Sosa testified that she told Ortiz that Macias "got a nicer truck because he was dealing with the drugs, you know, he was taking [a] bigger risk than us with the money." Trial Tr., R. 333 at PageID # 1928–29. And two of the women who deposited money along with Ortiz—including Ortiz's sister, Laura—thought that it was "obvious" that the money came from drugs. (For the same reasons, we reject Ortiz's argument that the district court erred when it enhanced her guidelines range on the ground that the cash she deposited was drug proceeds.)

The government also presented sufficient evidence that Ortiz knew or was willfully blind to the fact that the deposits were structured to avoid a reporting requirement under state or federal law. Every one of the more than 50 deposits that Ortiz made (and every one of her co-conspirators' deposits) was made in an amount less than $10,000, even though—as Ortiz well knew—every one of those deposits came from a pile of cash much greater than $10,000. Ortiz also knew that she

and her conspirators went to great lengths—by separating the cash into smaller amounts, and by making multiple deposits at multiple banks each trip—to keep each deposit under $10,000, even though the total amount deposited was often about ten times that amount. Ortiz was also told to use a cover story when making the deposits; she was often nervous about making them; and she did not want to use her own identification card when doing so. And Ortiz herself said that she "knew that something wasn't right" with the deposits. Trial Tr., R. 334 at PageID # 2006. Thus, considering the evidence in the light most favorable to the government, a rational jury could infer that Ortiz knew or chose to remain willfully blind to the fact that her deposits were structured to avoid a state or federal reporting requirement.

Ortiz responds that the testimony of her co-conspirators was not credible, but credibility was an issue for the jury to decide. *See United States v. Graham*, 622 F.3d 445, 449 (6th Cir. 2010). Ortiz also says that she did not know what money laundering was until an agent explained it to her after her arrest; but § 1956(a)(1)(B)(ii) "does not require that the defendant know that structuring or money laundering is a crime." *United States v. Hill*, 167 F.3d 1055, 1070 (6th Cir. 1999). Sufficient evidence therefore supported her money-laundering conviction.

For the same reasons, we reject Ortiz's argument that the district court abused its discretion when it instructed the jury that it could find the knowledge requirements of § 1956(a)(1)(B)(ii) met if it was "convinced that [Ortiz] deliberately ignored a high probability" that the cash she deposited "represented the proceeds of some form of unlawful activity[,]" that the deposits were structured "to avoid a transaction requirement[,]" and that Ortiz had "deliberately closed her eyes to what was obvious." Trial Tr., R. 468 at PageID # 3048. To the contrary, we agree with the district court that Ortiz's case was "a prime example of when [the deliberate ignorance instruction] should be given." *Id.* at 3030.

Ortiz next argues that the district court erred in its determination of the amount of cash that Ortiz laundered (a determination that increased her offense level by 14 for purposes of computing her guidelines range). We review that determination for clear error. *See United States v. Donadeo*, 910 F.3d 886, 893 (6th Cir. 2018).

A DEA agent testified that Ortiz made deposits on seven money-laundering trips with her co-conspirators. Together, the group laundered between $70,000 and $100,000 on each trip. On each of the seven trips, the group coordinated their activities (*e.g.*, no two women deposited money into the same account at the same bank branch) and used the same scheme (they made deposits at multiple banks into accounts identified by Sosa). Thus, the district court properly included the money laundered by Ortiz's co-conspirators in the amount for which Ortiz was responsible. *See Donadeo*, 910 F.3d at 893–94. And the district court estimated that the group deposited $85,000 for each of the seven laundering trips—the midpoint between $70,000 and $100,000. The resulting calculation, $595,000, is a reasonable estimate of the amount deposited by the group, and thus the amount for which Ortiz was responsible. Hence the court did not clearly err.

Finally, Ortiz argues that she was entitled to a four-level reduction because, she says, she was a minimal participant in the conspiracy. *See* U.S.S.G. § 3B1.2(a). Again, we review the district court's determination only for clear error. *United States v. Randolph*, 794 F.3d 602, 616 (6th Cir. 2015). A defendant is a minimal participant when she is "plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2 cmt. n.4. Moreover, the relevant comparison is not with members of the cartel, as Ortiz suggests, but with her money-laundering co-conspirators: Laura, Arlenne, and Sosa. *See id.* True, by that measure Sosa had a leadership role; but—as the district court correctly pointed out—that does not mean that "everyone else gets a minor role reduction." Sentencing Tr., R. 447 at PageID # 2889. Moreover, Ortiz made seven

money-laundering trips in only five months before she was arrested; and at her suggestion the group expanded its deposits to banks in North Carolina. The district court therefore did not clearly err in finding that Ortiz was an average participant in the conspiracy rather than a minimal one.

*    *    *

The district court's judgments are affirmed.