RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0132p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 17-5743

DANIEL SEXTON,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:16-cr-00040-1—Danny C. Reeves, District Judge.

Argued: May 1, 2018

Decided and Filed: July 5, 2018

Before: MOORE, CLAY, and KETHLEDGE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Michael M. Losavio, Louisville, Kentucky, for Appellant. Dmitriy Slavin, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee. **ON BRIEF:** Michael M. Losavio, Louisville, Kentucky, for Appellant. Dmitriy Slavin, Charles P. Wisdom Jr., UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

CLAY, J., delivered the opinion of the court in which KETHLEDGE, J., joined, and MOORE, J., joined in part. MOORE, J. (pg. 17), delivered a separate opinion concurring in part and dissenting in part.

_____

**OPINION**

_____

CLAY, Circuit Judge.  Defendant Daniel Sexton ("Sexton") appeals from the judgment entered by the district court sentencing him to 109 months' imprisonment, and ordering him to pay $2,637,058.32 in restitution and to forfeit property to the government, including a money judgment of $2,534,912.  For the reasons set forth below, we **AFFIRM** the decision of the district court.

**BACKGROUND**

**I.    Factual History**

Sexton operated a number of businesses in Kentucky.  Jonathan Williams ("Williams") was a certified public accountant ("CPA") who acted as manager or co-owner of Sexton's companies.  Sheila Flynn ("Flynn") was the office manager.  Between May 2006 and September 2010, Sexton and his co-conspirators secured loans for the businesses from banks by making misrepresentations about the businesses' assets and the identity of the true borrowers.  For example, Sexton owned three mobile home parks, and Sexton and Williams submitted financial records to banks and other lenders valuing the parks significantly higher than their actual value. Sexton and Williams also submitted to banks financial records falsely valuing a jet, and false and unfiled tax returns containing inflated adjusted gross income amounts. In addition, they arranged for straw purchases of condominiums that Sexton owned that were in foreclosure proceedings.

The banks who issued the loans included PBI Bank, Community Trust Bank, Farmers National Bank, Forcht Bank, and Central Bank.  The total amount of funds disbursed from these banks was $8,160,400.  Sexton and Williams also submitted applications for higher loan amounts ($13,600,000 and $13,800,000) toward the end of the time period involved, but those loan funds were never disbursed.

## II.    Procedural History

On May 5, 2016, Sexton, along with Williams, Flynn, and Joseph Tobin ("Tobin"), a bank loan officer at PBI Bank, was charged in a twenty-four count indictment. Count 1 alleged conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349 and 18 U.S.C. § 1344(1), and Counts 2–24 alleged bank fraud in violation of 18 U.S.C. § 1344(1) and 18 U.S.C. § 2. The indictment also alleged forfeiture to the U.S. of certain property pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982(a)(2)(A), and 28 U.S.C. § 2461(c).

On February 3, 2017, Sexton pleaded guilty to Count 1 pursuant to a plea agreement. At sentencing, the government moved to dismiss Counts 2–24. On March 28, 2017, a Presentence Investigation Report ("PSR") was prepared for Sexton. Relevant to this appeal, the PSR gave Sexton a four-level increase for being an organizer or leader under USSG § 3B1.1(a). The PSR also gave Sexton one criminal history point pursuant to USSG §§ 4A1.1(c), 4A1.2(m), and 4A1.2(f) for a 2005 California sentence for willful infliction of corporal injury to which Sexton pleaded nolo contendere. Finally, the PSR gave Sexton another two criminal history points pursuant to USSG § 4A1.1(d) for committing the instant offense while on probation for the California sentence. Sexton's guideline imprisonment range was 97–121 months. Sexton objected to both the organizer/leader adjustment and his criminal history calculation.

Sexton was sentenced on June 19, 2017. At sentencing, the district court overruled Sexton's objections to the organizer/leader enhancement and to the criminal history score. The district court applied the leader enhancement, finding that there were more than five participants, that Sexton exercised responsibility, leadership, or organizational responsibility over Flynn, that the conspiracy was otherwise extensive, and that Sexton was entitled to a large share of the fruits of the crime. The court also assessed three criminal-history points finding that the California case represented a prior sentence and that Sexton committed the instant offense while still serving that sentence. The court sentenced Sexton to 109 months in prison.

On June 27, 2017, Sexton timely filed his notice of appeal. He argues on appeal that the district court incorrectly increased his criminal history score three points based on the California sentence, that the district court incorrectly applied the organizer/leader enhancement, that

Sexton's sentence was substantively and procedurally unreasonable, and that both the forfeiture order and restitution judgment were erroneous.

**DISCUSSION**

**I.      Criminal History Score**

**Standard of Review**

"In reviewing a district court's application of the Sentencing Guidelines, this Court will 'accept the findings of fact of the district court unless they are clearly erroneous and [will] give due deference to the district court's application of the Guidelines to the facts.'" *United States v. Moon*, 513 F.3d 527, 539–40 (6th Cir. 2008) (quoting *United States v. Williams*, 355 F.3d 893, 897–98 (6th Cir. 2003)).  "We review a district court's legal conclusions regarding the Sentencing Guidelines *de novo*."  *Id*. at 540 (citing *United States v. Latouf*, 132 F.3d 320, 331 (6th Cir. 1997)).  "We review de novo a district court's criminal history calculation."  *United States v. Paseur*, 148 F. App'x 404, 408 (6th Cir. 2005) (citing *United States v. Wheeler*, 330 F.3d 407, 411 (6th Cir. 2003)).

**Analysis**

A defendant's criminal history category is determined by looking at USSG §§ 4A1.1 and 4A1.2.  A district court assigns zero to three criminal history points for each of a defendant's prior sentences.  USSG § 4A1.1.  A prior sentence is "any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of nolo contendere, for conduct not part of the instant offense."  USSG § 4A1.2(a)(1).  If the prior sentence was not a "sentence of imprisonment," the district court adds one point.  USSG § 4A1.1(c).  After assigning points for each of the prior sentences, the district court must determine whether the present offense was committed "while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status."  USSG § 4A1.1(d).  If so, the court must add two points.  *Id*.

On September 19, 2005, Sexton pleaded nolo contendere to willful infliction of corporal injury in the Los Angeles Superior Court of California.  The court found Defendant guilty.  The

court did not sentence Sexton to prison, but placed Sexton on 24 months of summary probation with several conditions. The court provided that if Sexton successfully completed summary probation, he would be permitted to withdraw his plea and the case would be dismissed. On December 23, 2008, Sexton was permitted to withdraw his plea, and the case was dismissed.

The district correctly assessed one criminal history point for this prior California sentence under USSG § 4A1.1(c). Though Sexton was not sentenced to prison, he was placed on probation by the California court, which is treated as a sentence under §4A1.1(c). USSG § 4A1.2 cmt. n.2. That Sexton was eventually permitted to withdraw his plea makes no difference. A "diversionary disposition resulting from a finding or admission of guilt, or a plea of nolo contendere, in a judicial proceeding is counted as a sentence under § 4A1.1(c) even if a conviction is not formally entered." USSG § 4A1.2(f). This rule "reflects a policy that defendants who receive the benefit of a rehabilitative sentence and continue to commit crimes should not be treated with further leniency." USSG § 4A1.2 cmt. n.9. The arrangement provided by the California court fits within the definition of a diversionary disposition under § 4A1.2(f). Sexton's sentence was not otherwise reversed, vacated, invalidated, or expunged. *See id*. § 4A1.2 cmt. n.6, 10.

The district also correctly assessed two criminal history points under USSG § 4A1.1(d). Sexton became involved in the instant conspiracy beginning in 2006, which was while he was still on probation for this prior California sentence.

Because the district court did not err in its criminal history analysis, we affirm the district court's criminal history calculation.

## II.     Leadership Adjustment

### Standard of Review

"We review the district court's 'legal conclusion that a person is an organizer or leader under [§] 3B1.1' deferentially, and its factual findings for clear error." *United States v. House*, 872 F.3d 748, 751 (6th Cir. 2017) (quoting *United States v. Olive*, 804 F.3d 747, 759 (6th Cir. 2015)). "Under the clear-error standard, we abide by the court's findings of fact unless the

record leaves us with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *United States v. Yancy*, 725 F.3d 596, 598 (6th Cir. 2013)).

**Analysis**

Section 3B1.1(a) of the Sentencing Guidelines mandates a four-point offense-level increase "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." To decide whether a defendant was an "organizer or leader," the Guidelines direct courts to consider a number of factors, including "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." USSG § 3B1.1 cmt. n 4. "A district court need not find each factor in order to warrant an enhancement." *United States v. Castilla-Lugo*, 699 F.3d 454, 460 (6th Cir. 2012) (citing *United States v. Gates*, 461 F.3d 703, 709 (6th Cir. 2006)). "There can . . . be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." USSG § 3B1.1 cmt. n.4.

However, "[t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." USSG § 3B1.1 cmt. n.2. If a defendant did not organize, lead, manage, or supervise another participant, an upward departure may be warranted if the defendant "nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization." *Id*. This means the enhancement can be applied "where a defendant has 'exerted control over at least one individual within a criminal organization,' but not where the defendant has 'merely exercised control over the property, assets or activities of the enterprise.'" *United States v. Swanberg*, 370 F.3d 622, 629 (6th Cir. 2004) (quoting *United States v. Gort-DiDonato*, 109 F.3d 318, 321 (6th Cir. 1997)).

"The government bears the burden of proving that the enhancement applies by a preponderance of the evidence." *United States v. Vandeberg*, 201 F.3d 805, 811 (6th Cir. 2000) (citing *United States v. Martinez*, 181 F.3d 794, 797 (6th Cir. 1999)).

Sexton does not argue that the district court erred in finding the five participant requirement to have been satisfied and does not address the district court's finding that the criminal activity was otherwise extensive. Accordingly, we do not consider those issues, and instead address only whether the district court erred in concluding that Sexton was an organizer or leader of the conspiracy. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).

The district court reasonably found that Sexton exerted control over a single individual within the criminal organization, Sheila Flynn. At sentencing, Flynn testified that she worked for one of Sexton's companies and that Sexton was her boss. Flynn testified that she prepared false documents while working at Sexton's company and under Sexton's direction, including false bank statements, false rent rolls, and a false airline appraisal. She testified that after preparing those documents, she gave them to either Williams or Sexton. She testified that the documents were then submitted to banks or loan companies. Flynn also testified that Sexton fired her in October 2005. At that time, Sexton received a foreclosure notice on his properties, decided to go to California, and took $25,000 in cash with him. In response, and while Sexton was gone, Williams and Flynn tried to seize control of the company. When Sexton returned from California, he fired Williams and Flynn and retook control of the company. He later rehired both Williams and Flynn. In light of this evidence, the district court reasonably found that that Sexton "exerted control over at least one individual within [the] criminal organization." *Swanberg*, 370 F.3d at 629.

Sexton did not merely exercise authority over one participant. Turning to the other factors, the district court also reasonably found that Sexton had a right to a larger share of the fruits of the crime. For instance, Flynn testified that some of the money from the loans "went back into the property, but a majority of it was diverted to a house in the Bahamas and a house in Indiana." (R. 262, Sentencing Tr., PageID # 1077.) She testified that the house in the Bahamas belonged to Sexton, and the house in Indiana belonged to Sexton's girlfriend. Flynn also testified that the money for Sexton's trips to California came from the rents that the company

collected, even though the rent money was supposed to pay off the loans or bills the company incurred.

A third factor, the nature of participation in the commission of the offense, also supports the district court's conclusion. Sexton owned and operated a number of businesses involved in the scheme. His companies' assets were used to secure the loans, and his employees were used to carry out the fraudulent activities. The companies were the vehicle through which the bank fraud was accomplished. And Sexton was not a mere owner or operator of the businesses. Sexton knew of the role his businesses and employees played in the scheme, allowed the scheme to continue, participated in the scheme,[1] and benefitted from the scheme both personally and as owner and operator of those businesses. *See United States v. Lewis*, 21 F. App'x 320, 322 (6th Cir. 2001).

In all, three of the factors laid out by the Guidelines cut in favor of finding Sexton was a leader of the criminal activity. That Williams may have qualified as a leader during the same period of time does not preclude Sexton from also occupying a leadership or organizational role. USSG § 3B1.1 cmt. n.4; *United States v. Sadler*, 750 F.3d 585, 594 (6th Cir. 2014). That Williams may have been the actual brains behind the operation also does not preclude Sexton from being a leader when there is sufficient other evidence of Sexton's leadership role. *United States v. Burley*, 241 F. App'x 290, 296–97 (6th Cir. 2007).

Sexton was the owner and operator of companies that were used to perpetrate bank fraud. He opened up his businesses to carry out the fraudulent enterprise. He bankrolled the operation and provided the infrastructure for the conspiracy by allowing his assets and employees to be used to accomplish the fraud. He knew of the fraud, took actions to assist in the fraud, personally and professionally benefitted from the fraud, and at the very least implicitly approved of the fraud. Sexton also exerted control over at least one member of the conspiracy. Because

---

[1]For instance, Sexton, along with Williams, met with potential lenders for the purpose of securing loans. Further, Flynn testified at sentencing that Sexton had to sign his false personal financial statements and also the disbursements that would allow them to get the money that would go to buy houses. Even Sexton's attorney admitted at sentencing that Sexton was "certainly a participant and an active participant in the offense" and "may at times, that may have been close to or even crossed the line of some sort of supervisory activity." (R. 262, Sentencing Tr., PageID # 1088.)

several of the factors listed in the Guidelines support the district court's finding, and because we give due deference to the district court's conclusion that the leadership enhancement applies, the district court did not err in applying the leadership enhancement in this case.

Accordingly, we affirm the district court's application of the enhancement.

**III.      Substantive Reasonableness**

**Standard of Review**

This Court reviews sentencing decisions deferentially for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 41 (2007).

**Analysis**

This Court reviews a sentence for reasonableness. *United States v. Payton*, 754 F.3d 375, 377 (6th Cir. 2014). "This review has two components: procedural reasonableness and substantive reasonableness." *United States v. Solano-Rosales*, 781 F.3d 345, 351 (6th Cir. 2015).

A district court commits a procedural error by "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Gall*, 552 U.S. at 51.

To be substantively reasonable, the sentence "must be proportionate to the seriousness of the circumstances of the offense and offender, and sufficient but not greater than necessary, to comply with the purposes of § 3553(a)." *United States v. Vowell*, 516 F.3d 503, 512 (6th Cir. 2008) (citation and internal quotation marks omitted). "A sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008) (citing *United States v. Webb*, 403 F.3d 373, 385 (6th Cir. 2005)).

We "afford[] a rebuttable presumption of reasonableness to a properly calculated, within-Guidelines sentence." *United States v. Graham*, 622 F.3d 445, 464 (6th Cir. 2010) (citing *United States v. Vonner*, 516 F.3d 382, 389–90 (6th Cir. 2008) (en banc)).

The district court sentenced Sexton to the middle of the Guidelines range after explicitly mentioning and reviewing a number of § 3553(a) factors, and after considering and rejecting Sexton's arguments. The court concluded, after considering "all of the factors of 3553, I do find that a sentence in the middle of the range is entirely appropriate and justified in this particular matter." (R. 262, Sentencing Tr., PageID # 1139.)

Sexton's main challenge is to the district court's weighing of those factors, specifically failing to give enough weight to his "minor and overstated criminal history, a family, personal remorse and acceptance of responsibility."[2] (Sexton Br. at 48.) However, "the manner in which a district court chooses to balance the applicable sentencing factors is beyond the scope of the Court's review." *United States v. Adkins*, 729 F.3d 559, 571 (6th Cir. 2013) (citing *United States v. Sexton*, 512 F.3d 326, 332 (6th Cir. 2008); *United States v. Ely*, 468 F.3d 399, 404 (6th Cir. 2006)). And "[w]here a district court explicitly or implicitly considers and weighs all pertinent factors, a defendant clearly bears a much greater burden in arguing that the court has given an unreasonable amount of weight to any particular one." *Id.* (quoting *United States v. Thomas*, 437 F. App'x. 456, 458 (6th Cir. 2011)). The district court did consider all of the factors mentioned by Sexton and found that many of them weighed against giving him a lower sentence. For instance, the court considered Sexton's criminal history and decided that it, as well as his multiple pre-sentence bond violations relating to cocaine use, weighed in favor of the Guidelines sentence provided. Further, the district court considered recalculating the Guidelines range to remove the acceptance of responsibility credit because Sexton was "pointing the finger at everybody else." (R. 262, Sentencing Tr., PageID # 1133–34.)

---

[2]On appeal, Sexton also argues that the district court erred in failing to consider Sexton's age, citing to the Sentencing Commission's report on the effects of aging on recidivism. However, Sexton did not raise this report or argument to this Court until his reply brief and did not raise it to the district court at all. Consequently, we will not consider this argument. *United States v. Lopez-Medina*, 461 F.3d 724, 743 n.4 (6th Cir. 2006) (deeming an argument raised for the first time in a reply brief, but not the main brief, waived (citing *McPherson*, 125 F.3d at 995–96)); *United States v. Embry*, No. 17-1923, 2018 WL 1567388, at *4 (6th Cir. Mar. 30, 2018) ("We cannot find that the sentencing court abused its discretion by failing to consider an argument that Defendant did not raise, particularly where, as here, the court would have been obligated only to consider—not to accept—the argument.").

Because the district court justified its sentence with reference to the purposes of § 3553(a) and because a within Guidelines sentence is presumed reasonable, we cannot say that Sexton's sentence is unreasonable. Accordingly, we affirm Sexton's sentence.

## IV. Forfeiture

### Standard of Review

"We review the interpretation of federal forfeiture laws *de novo.*" *United States v. Hampton*, 732 F.3d 687, 690 (6th Cir. 2013). "However, as [Sexton] concedes, because [he] failed to object to entry of the forfeiture money judgment on any grounds, our review is for plain error." *Id*. "Plain error requires that the defendant show error that is plain and that 'affects substantial rights' and, if shown, also that the 'error seriously affects the fairness, integrity, or public reputation of the judicial proceedings.'" *Id.* (citing *Johnson v. United States*, 520 U.S. 461, 462 (1997)).

### Analysis

The civil forfeiture statute, 18 U.S.C. § 981(a)(1)(C), permits the forfeiture of "proceeds traceable to a violation of section . . . 1344 of this title . . . or a conspiracy to commit such offense." However, under 28 U.S.C. § 2461(c), "[t]he government may seek criminal forfeiture for violation of any federal statute 'for which the civil or criminal forfeiture of property is authorized.'" *Hampton*, 732 F.3d at 690 (citing 28 U.S.C. § 2461(c)).

Sexton pleaded guilty to conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 1349 and 1344, and the money judgment against Sexton was entered pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). The money judgment amount was for $2,534,912. On appeal, Sexton argues that the district court plainly erred in holding Sexton liable for this amount in light of *Honeycutt v. United States*, 137 S. Ct. 1626 (2017).

In *Honeycutt*, the Supreme Court examined 21 U.S.C. § 853, a different forfeiture statute than the one involved in this case. *Id*. at 1635. Section 853(a) provides, "[a]ny person convicted of a violation of this subchapter . . . shall forfeit to the United States . . . (1) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the

result of such violation." First, the Supreme Court concluded that for the forfeiture statute to apply, the property needs to be tainted, meaning that it flows from the crime. 137 S. Ct. at 1632. Second, the Supreme Court determined that forfeiture is limited to property that the defendant actually acquired. *Id*. at 1632–33. The Supreme Court relied on the phrase "the person obtained" in § 853 to make this conclusion. *Id*. Finally, the Supreme Court looked to other parts of the statute, which supported limiting forfeiture to the property the defendant actually acquired as a result of the crime. *Id*. at 1633. The Supreme Court ultimately held that "[f]orfeiture . . . is limited to property the defendant himself actually acquired as the result of the crime." 137 S. Ct. at 1635. The Supreme Court further held that a defendant may not be "held jointly and severally liable for property that his co-conspirator derived from the crime but that the defendant himself did not acquire." *Id*. at 1630.

Since *Honeycutt* was decided, two other circuits have determined that its reasoning also applies to forfeiture under 18 U.S.C. § 981(a)(1)(C). *See United States v. Gjeli*, 867 F.3d 418, 427 n.16 (3d Cir. 2017), *as amended* (Aug. 23, 2017); *United States v. Carlyle*, 712 F. App'x 862, 864 (11th Cir. 2017). However, we believe those circuits were incorrect. Unlike § 853(a)(1), 18 U.S.C. § 981(a)(1)(C) does not contain the phrase "the person obtained," which was the linchpin of the Supreme Court's decision in *Honeycutt*. Under § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section . . . 1344 of this title . . . or a conspiracy to commit such offense" is "subject to forfeiture to the United States." While property must be connected, or "traceable," to the crime, it does not need to be property that the particular defendant received. As long as the property is connected to the crime, a defendant can be liable for property that his codefendant acquired. Consequently, we hold that the reasoning of *Honeycutt* is not applicable to § 981(a)(1)(C). And Sexton's challenge to the district court's forfeiture order fails. Accordingly, we affirm the district court's forfeiture order.

## V. Restitution

### Standard of Review

"We review the propriety of a restitution order de novo." *United States v. Church*, 731 F.3d 530, 535 (6th Cir. 2013) (citing *Johnson*, 440 F.3d at 849). "'Because federal courts have no inherent power to award restitution,' restitution orders are proper 'only when and to the extent authorized by statute.'" *Id.* (quoting *United States v. Evers*, 669 F.3d 645, 655–656 (6th Cir. 2012)). Because Sexton did not object to the amount of restitution, this Court reviews for plain error. *United States v. Koeberlein*, 161 F.3d 946, 951 (6th Cir. 1998).

### Analysis

Under the Mandatory Victim Restitution Act ("MVRA"), "a district court must order restitution from a defendant convicted 'of an offense against property . . . including any offense committed by fraud or deceit' if an identifiable victim has suffered a loss." *United States v. Gale*, 468 F.3d 929, 941 (6th Cir. 2006) (citing 18 U.S.C. § 3663A(a)(1), (c)(1)). The government "must prove the bank's loss by a preponderance of the evidence." *United States v. Kratt*, 579 F.3d 558, 565 (6th Cir. 2009) (citing 18 U.S.C. § 3664(e)). "In calculating restitution, 'the loss caused by the conduct underlying the offense of conviction establishes the outer limits of a restitution order.'" *Id.* (quoting *Hughey v. United States*, 495 U.S. 411, 420 (1990)). The district court may hold co-defendants jointly and severally liable for the restitution amount. *United States v. Bogart*, 576 F.3d 565, 575–76 (6th Cir. 2009) (citing 18 U.S.C. § 3664(h)).

In the plea agreement, the parties agreed to recommend a restitution amount of $2,534,912. The parties reserved the right to "object or argue in favor of other calculations." (R. 154, Plea Agreement, PageID # 441.) The PSR, which was prepared after the plea agreement was entered into, calculated a restitution amount of $2,637,058.32. The district court ordered restitution in the amount of $2,637,058.32. The court explained that the number contained in the plea agreement was lower than the number contained in the PSR because one of the financial institutions was not able to sell some of the collateral for as much as it had originally agreed upon. The court noted that it was a joint and several obligation with Williams for the same amount, and with Flynn up to $1,467,674.

On appeal, Sexton first argues that the "charge-off" methodology used in the PSR to calculate loss was "not defined as to allow determination that [the losses] are legal in any way whatsoever." (Sexton Br. at 34.) But Sexton has not cited case law where a similar methodology was found inappropriate. And we are not persuaded by Sexton's argument. The district court based its restitution amount on the PSR, which detailed the methodology for calculating loss. The PSR explained that "[e]ach of the banks (PBI, Farmers, Forcht, and Community Trust) that lent money to the defendants, or their straw borrowers, have supplied records detailing the loan amounts, payment history, and collateral for each loan." (PSR, PageID # 740.) The records provided by the banks specified "charge-off" amounts for each loan. (*Id.*) The "charge-off" amount "is the amount of money that a bank determines it has incurred in the event of a borrower's default." (*Id.*) "The charge-off amount for a loan is calculated by subtracting the appropriate credits against loss, including but not limited to, payments made on the loan and liquidated collateral, from the principal loan balance (interest and fees are not included). The resulting difference approximates a bank's pecuniary loss for a particular loan." (*Id.*) The PSR indicated where numbers had changed due to the sale of collateral. Because the PSR detailed how it calculated the banks' losses, we do not think it was plain error for the district court to accept the PSR's "charge-off" methodology in order to calculate the banks' losses. *See United States v. Carmichael*, 676 F. App'x 402, 406 (6th Cir. 2017).

Sexton's remaining argument disputes a specific portion of the PSR's loss calculation—about $50,000 in losses claimed by Forcht Bank. More specifically, Forcht Bank provided a supplemental declaration of victim losses, which included amounts for accrued interest, late fees, legal fees, property taxes, force place insurance, and appraisal fees.

Sexton argues that "[t]he restitution statute does not provide" for these items to be included in a restitution order. (Sexton Br. at 38–39.) Where an "offense does not involve damage to or loss or destruction of property . . . the MVRA 'requires only that the restitution ordered by the district court be based on losses caused by the specific conduct that is the basis for the offense of conviction.'" *United States v. Elson*, 577 F.3d 713, 726 (6th Cir. 2009) (quoting *United States v. Akbani*, 151 F.3d 774, 780 (8th Cir. 1998)). Under 18 U.S.C. § 3663A(b)(4), the district court must order restitution to "reimburse the victim for . . . other expenses incurred

during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." In *Elson*, the Court concluded that the specific attorney fees involved in the case were "directly related to the offense of conviction," and therefore "recoverable as restitution under the MVRA." *Elson*, 577 F.3d at 728. However, the Supreme Court recently decided *Lagos v. United States*, --- U.S. ---, 138 S. Ct. 1684 (2018), which abrogated *Elson*. In *Lagos*, the Supreme Court held that, based on the statute's language, a restitution award under § 3663A(B)(4) is "limited to government investigations and criminal proceedings" and cannot include "expenses incurred *before* the victim's participation in a government's investigation began." *Id*. at 1688, 1690.

Forcht Bank's declaration included $12,554.14 in legal fees that it accrued, but it is not clear that Forcht Bank accrued those fees within the limits that the Supreme Court set in *Lagos*. The record does not contain any information as to whether Forcht Bank paid those fees as part of the government's investigation and criminal proceedings. Because it is not clear to us how these fees were accrued, it is hard to say that the district court committed any error. To the extent Sexton's argument challenges the district court's findings as to the amount of loss, this Court has previously held that "a district court is required to make adequate factual findings in calculating the loss amount when there is a 'disputed portion of the presentence report or other controverted matter.'" *United States v. McGlown*, 380 F. App'x 487, 491 (6th Cir. 2010) (quoting *United States v. Darwich*, 337 F.3d 645, 666 (6th Cir. 2003)). However, because Sexton did not dispute the restitution amount, the district court was not required to make more specific factual findings, and because the district court was not required to make more specific factual findings, it did not plainly err as a result of failing to make such findings.

As to the remaining figures in Forcht Bank's declaration, Sexton provides no evidence that the losses were unrelated to the conspiracy. And Sexton cites a number of cases from both inside and outside this Circuit where courts have properly included similar fees in a restitution order. *See, e.g.*, *United States v. Robers*, 698 F.3d 937, 955 (7th Cir. 2012) (permitting the inclusion in the restitution award of line-item expenses like property taxes, insurance, and accrued interest). We do not think that Sexton has shown an error that is "obvious or clear." *Koeberlein*, 161 F.3d at 949.

Because the district court did not commit plain error by ordering $2,637,058.32 in restitution, we affirm the district court's restitution award.

**CONCLUSION**

For the reasons set forth above, we **AFFIRM** the decision of the district court.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part. I join the majority opinion except for the portion concluding that the Supreme Court's recent decision in *Lagos v. United States*, --- U.S. ---, 138 S. Ct. 1684, 1687 (2018), does not require us to vacate the portion of the restitution award for Forcht Bank's legal fees. According to the majority, the district court did not plainly err because the parties, while at the district court, did not dispute Forcht Bank's $12,554.14 in legal fees.

"The general rule, however, is that an appellate court must apply the law in effect at the time it renders its decision." *Thorpe v. Hous. Auth. of City of Durham*, 393 U.S. 268, 281 (1969). A related concept is that a district court's initially correct determination can become wrong because of a change in law, and this scenario mandates that an appellate court conclude that the district court plainly erred. *Henderson v. United States*, 568 U.S. 266, 279 (2013); *see also Johnson v. United States*, 520 U.S. 461, 468 (1997).

In Sexton's case, although the district court's award of restitution for Forcht Bank's legal fees might have been correct before *Lagos*, nonetheless after the Supreme Court's decision, restitution must be tied to a government investigation or to a criminal proceeding. *Lagos*, 138 S. Ct. at 1687. Because the government has "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense" under 18 U.S.C. § 3664(e), the government needed to prove that Forcht Bank's legal fees stemmed from a government proceeding or a criminal investigation. The government, however, has not met its burden because it is not clear from the district court record that Forcht Bank accrued these legal fees within the limits that the Supreme Court recently set in *Lagos*. Therefore, the district court's restitution award for Forcht Bank's legal fees is no longer valid.

In light of the new import of *Lagos*, I would remand to permit the government to attempt to meet its burden of proof regarding the restitution to Forcht Bank of its $12,554.14. Otherwise, I concur in full in the majority opinion.