FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

VASSILY ANTHONY
THOMPSON,
*Defendant-Appellant.*

No. 18-30206

D.C. No.
2:16-cr-00145-TOR-1

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

DERRICK JOHN FINCHER,
*Defendant-Appellant.*

No. 18-30208

D.C. No.
2:16-cr-00145-TOR-2

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Thomas O. Rice, District Judge, Presiding

Argued and Submitted May 4, 2020
Seattle, Washington

Filed March 3, 2021

Before: Andrew J. Kleinfeld, William A. Fletcher, and
          Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Kleinfeld

## SUMMARY[*]

### Criminal Law

The panel affirmed in part, reversed in part, and remanded in a case in which two defendants appealed (1) their convictions for conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1343 and 1349, and (2) the forfeiture provisions of their sentences.

Appellants argued that because the indictment charged their crimes as it would for an 18 U.S.C. § 371 conspiracy by including "Overt Acts," the indictment should be treated as conspiracy under Section 371, and that allowing the jury to convict Appellants of a Section 1349 conspiracy in effect amended the indictment improperly. Appellants, who were sentenced to 108 and 135 months respectively, asserted that this court should therefore remand for resentencing under Section 371, which would reduce their maximum exposure to five years. Rejecting this argument, the panel wrote that the overt-acts language was surplusage with respect to what Appellants were actually charged with and convicted of, and there is no constructive amendment of the indictment because

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the indictment alleged all of the elements of Sections 1343 and 1349.

The panel vacated the forfeiture judgment against Appellants and remanded because the judgment amounted to joint and several liability contrary to *Honeycutt v. United States*, 137 S. Ct. 1626 (2017), in which the Supreme Court held that, in a conspiracy, a defendant may not, for purposes of forfeiture, be held jointly and severally liable for property that his co-conspirator derived from the crime but that the defendant himself did not acquire. The panel held that *Honeycutt*, which involved 21 U.S.C. § 853, applies to 18 U.S.C. § 981 because the differences between the two statutes are immaterial in light of *Honeycutt*'s reasoning and language. The panel explained that the text of Section 981 and its roots in common law forfeiture, like the statute in *Honeycutt*, necessitate a connection to tainted property. The panel wrote that, on remand, the district court should make findings denoting approximately how much of the proceeds of the crime came to rest with each of the conspirators; and that the forfeiture judgments must be separate, for the approximate separate amounts that came to rest with each of them after the loot was divided among the swindlers.

## COUNSEL

Stephen R. Hormel (argued), Hormel Law Office LLC, Spokane Valley, Washington; Nicolas Vernon Vieth (argued), Vieth Law Offices Chtd., Coeur d'Alene, Idaho; for Defendants-Appellants.

Joseph P. Derrig (argued) and Brian M. Donovan (argued), Assistant United States Attorneys; William D. Hyslop, United States Attorney; United States Attorney's Office, Spokane, Washington; for Plaintiff-Appellee.

**OPINION**

KLEINFELD, Circuit Judge:

We address two issues, whether the indictment was in effect improperly amended, and whether the forfeitures as imposed were contrary to the recent Supreme Court decision in *Honeycutt v. United States*.[1] The first issue is a straightforward application of established authority, but the second requires us to work through a new problem for our court.

Three people, Vassily Anthony Thompson, Derrick John Fincher, and John Patrick Nixon, stole a great deal of money from several people and firms with a classic "advance pay" scheme. In this kind of swindle, the victim is persuaded to pay money to the swindler in order to receive a much larger sum. The Thompson-Fincher-Nixon version persuaded the victims that the swindlers had access to considerable capital that could be loaned to the victims, but the victims would have to advance cash for fees and expenses. There was no capital available for the prospective loans, and the swindlers stole the advances. In this type of "long con," the maxim "you cannot cheat an honest man," does not apply. One can. The "long con" in this case was perfected with extremely

---

[1] 137 S. Ct. 1626 (2017).

elaborate and complex business documents and escrows, lulling the victims into victimhood, and appearing, until the victims sought the promised loans or to get their money back, to be genuine.

Eventually, the swindlers were caught. Nixon pleaded guilty pursuant to a plea bargain, and Thompson and Fincher were convicted in a jury trial and sentenced. Thompson and Fincher appeal the convictions and the forfeiture provisions of their sentences. We have jurisdiction under 28 U.S.C. § 1291. We lay out more details below, insofar as they bear on the legal issues.

## The Indictment

The superseding indictment under which the swindlers were convicted says in the title area that they were charged with conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1343 and 1349 and aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1). The identity theft charge was dropped and is not an issue in this appeal. The general allegations in the superseding indictment were that the three "worked with one another to offer false and fictitious loans to various parties in Idaho, Montana, and North Carolina." The loans and lines of credit would be offered after Thompson, Fincher, and Nixon "collected fees from these parties under the guise that the fees were being used to acquire the loans. No such loans or lines of credit existed."

The Idaho scheme promised a $6 million line of credit, but required a $160,000 advance fee to be sent to an escrow agent in Georgia, a law firm specializing in escrows. An email promised that the $160,000 would be disbursed to an

imaginary bank if the imaginary loan were approved, or returned if the customer cancelled the escrow. Of course, the imaginary loan was not made available, and the $160,000 was not returned.

The Montana deal required a $300,000 advance fee, supplemented by another $1 million, to get a $60 million or $70 million line of credit. The fees were deposited in a trust account maintained by another attorney, but no line of credit was made available.

The North Carolina scheme asked for an $855,000 advance to secure a fictitious $10 million line of credit, with the advance to be deposited into the trust account of a third attorney's firm.

The swindlers dressed the entire scheme up with genuine-looking escrow agreements, a memorandum of understanding, claims that Bank of America, Barclay's Bank, JP Morgan, the Federal Export Import Bank, RBC Royal Bank, and Landes Capital Management were involved, and lengthy, complex, and apparently genuine documentation.

The indictment recites all these facts in considerably greater detail, and then under a heading, "Overt Acts," incorporates them by reference. It then alleges multiple counts of wire fraud under 18 U.S.C. §§ 1343 and 1349 for the wire communications used to dupe the victims out of their money. The indictment also gives notice of criminal forfeiture allegations under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) for property derived from proceeds traceable to the offenses or substitute property under 21 U.S.C. § 853(p). The jury was instructed on conspiracy to

commit wire fraud and convicted Thompson and Fincher under 18 U.S. C. §§ 1343 and 1349.

Appellants argue that because the indictment charges their crimes as it would for an 18 U.S.C. § 371 conspiracy by including "Overt Acts," it should be treated as so charging. Thus, allowing the jury to convict them of an 18 U.S.C. § 1349 conspiracy in effect amended the indictment improperly. This objection was not raised in district court, but appellants argue that the improper amendment, effectively convicting them of something the grand jury did not charge, was plain error. This statutory distinction matters a great deal because a Section 371 conspiracy has a five year limit on the sentence, but a Section 1349 conspiracy has a twenty year limit. Thompson and Fincher were sentenced to 108 and 135 months (nine and over eleven years), respectively.

The indictment does indeed read, in many respects, as though it was drafted to charge a Section 371 conspiracy. It charges a conspiracy against the United States and alleges overt acts, which are necessary for a Section 371 conspiracy.[2] Relying on the rule that an indictment may not be broadened or altered to charge a different offense except by the grand jury itself,[3] the appellants challenge their conviction for wire fraud under Section 1349. Appellants assert that they were in

---

[2] *See United States v. Grasso*, 724 F.3d 1077, 1086 (9th Cir. 2013) (requiring an overt act for a Section 371 conspiracy).

[3] *United States v. Miller*, 471 U.S. 130, 144–45 (1985); *Stirone v. United States*, 361 U.S. 212, 215–17 (1960); *Ex parte Bain*, 121 U.S. 1, 10, 13 (1887), *overruled on other grounds*, *United States v. Cotton*, 535 U.S. 625 (2002).

effect charged with the lesser Section 371 crimes, and that we should remand for resentencing under Section 371, which would reduce their maximum exposure to five years of imprisonment.

Appellants are correct on general principles, but mistaken regarding application of the principles to this case. The Fifth Amendment protected them from being convicted of a crime that the grand jury did not charge, and changes could not be made at trial charging them with a crime for which they were not indicted.[4] But that did not happen.

The indictment says in the caption that the appellants were charged with wire fraud and conspiracy to commit wire fraud under 18 U.S.C. §§ 1343 and 1349. After setting out the basis of the charges, and unnecessarily stating overt acts, the indictment says that the alleged acts were "all in violation of 18 U.S.C. §§ 1343 and 1349." It never mentions 18 U.S.C. § 371. Appellants do not dispute that the indictment sets forth all the elements of Sections 1343 and 1349. They say only that it also sets forth all the elements of Section 371. Perhaps they could have been charged with and convicted of conspiracy against the United States under Section 371, but they were not. The language in the indictment that would have been necessary or appropriate for a Section 371 charge was surplusage with respect to what they actually were charged with and convicted of.[5] There is no constructive amendment of the indictment here because the indictment alleged all the elements of Sections 1343 and 1349. Appellants were tried and convicted of the crime charged, and

---

[4] *See, e.g.*, *Miller*, 471 U.S. at 144–45.

[5] *See United States v. Renzi*, 769 F.3d 731, 756–57 (9th Cir. 2014).

there was no reason to include in the jury instructions the surplusage relating to the Section 371 crime that was not charged.

Thompson and Fincher could not have been misled by the language in the indictment that would have been used in a Section 371 charge.  The indictment said consistently in the caption and the operative language that the charges were for wire fraud under Sections 1343 and 1349, never mentioning Section 371.[6]  As the Supreme Court held in *Miller*,

> As long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime. . . . A part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as "a useless averment" that "may be ignored."[7]

---

[6] *See Miller*, 471 U.S. at 134–35 (no prejudicial surprise where competent defense counsel should have been on notice of the offense charged); *see also Renzi*, 769 F.3d at 757) ("[A]dditional language in the indictment was surplusage and could be disregarded.") (citing *Bargas v. Burns*, 179 F.3d 1207, 1216 n.6 (9th Cir. 1999); *United States v. Pang*, 362 F.3d 1187, 1194 (9th Cir. 2004) ("The district court did not err by refusing to instruct the jury to find an element that really isn't an element. . . .  In any event, [defendant] failed to show that he was ambushed or misled in any way by the extraneous language in the information.").

[7] *Miller*, 471 U.S. at 136 (quoting *Ford v. United States*, 273 U.S. 593, 602 (1927)).

This case falls squarely within *Miller*.

## Forfeiture

Thompson and Fincher also challenge the forfeiture aspect of each of their sentences. This issue is considerably more difficult than the indictment issue discussed above because we must apply the teachings of a recent Supreme Court decision to distinct facts.

The district court found that the swindlers ultimately stole $160,000 in the Idaho fraud, $1,000,000 in the Montana fraud, and $855,000 in the North Carolina fraud, for a total of $2,015,000.

The $160,000 from the Idaho fraud went to one lawyer's trust account before being distributed into several accounts. At least one account, AEIO Youth, was owned by Thompson. AEIO Youth then issued Fincher checks totaling some thousands of dollars. The court said Fincher and Thompson jointly obtained all the fraud proceeds because it was a joint decision to have the money initially go into the attorney's trust account.

The $1,000,000 from the Montana fraud went to another attorney's trust account, directed by Thompson. There was no evidence that Fincher directed those proceeds. $196,500 was disbursed, however, to an account owned by Fincher in three separate transactions. Fincher later withdrew some of this money as a cashier's check to pay for a pickup truck. Fincher also wired $9,000 to Thompson.

The $855,000 from the North Carolina fraud went to a third attorney's trust account "controlled and directed" by

Thompson, but from which $275,000 was wired to Fincher's bank account.

The court held that Fincher obtained $631,500 of the total proceeds, even though the court found that less than that came to rest with Fincher. The court ordered Fincher to forfeit the pickup truck he had bought with the money he obtained from the frauds, plus $631,500 "representing the fraud proceeds Defendant obtained, directly and indirectly." The court also ordered Thompson to forfeit the pickup truck plus $2,015,000, "representing the fraud proceeds Defendant obtained, directly and indirectly." There are not two pickup trucks. The court was referring in the Thompson judgment to Fincher's truck. The court did not order any forfeiture from the third conspirator, Nixon, who had pleaded guilty before trial, and made no finding as to how much of the loot Nixon obtained.

In the forfeiture briefing and hearing, the prosecutor said that the FBI had administratively forfeited $77,882.85 from Thompson's bank account and $40,000 from Fincher's bank account—for a total of $117,882.85. The government recommended that this previously forfeited amount be credited evenly between the two swindlers, $58,941.42 for Fincher and $58,941.43 for Thompson. The government said it planned to keep track of what it managed to obtain from its forfeiture collection efforts, and cap recovery at $2,015,000. The district court's order, however, provides no means of enforcing any of these government promises or recommendations or so limiting the forfeitures.

Appellants argue that the forfeitures amounted to a joint and several forfeiture impermissible under the Supreme Court's recent decision in *Honeycutt*, and that the district

court should be required to apportion the total proceeds obtained individually by Fincher, Thompson, and Nixon, and enter money judgments against Thompson and Fincher without joint and several liability. The government argues that the forfeitures were not joint and several, and that the joint and several language in the judgment applied only to restitution. As for *Honeycutt*, the government argues that it was satisfied because neither the oral explanation of the sentences nor the preliminary forfeiture order used the phrase "joint and several." The government further argues that *Honeycutt* interpreted a different statute, not 18 U.S.C. § 981, and in any case was satisfied, because the swindlers jointly obtained and controlled all the money, comparing conspirators to a husband and wife who together use wire fraud to steal title to a house as tenants by the entirety.

We begin, of course, with the statute pursuant to which the forfeitures were ordered, 18 U.S.C. § 981, made applicable to criminal offenses by 28 U.S.C. § 2461:

> (a)(1) The following property is subject to forfeiture . . .
>
> . . . .
>
> (C) Any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.
>
> . . . .

(f) All right, title, and interest in property described in subsection (a) of this section shall vest in the United States upon commission of the act giving rise to forfeiture under this section.**[8]**

It is plain under the language of the statute that the stolen money and the pickup truck bought with stolen money are forfeitable, and that the forfeiture extends to the money traceable to what was sent to the three trust and escrow accounts. Two things are noticeable, for purposes of this case, about the language of this statute. First, it uses the traditional common law concept that title to the tainted property passes to the United States upon commission of the criminal act. Second, only property that is traceable to the proceeds is forfeitable, not other property that the criminal may own (absent the government going through the procedures to forfeit substitute property under 21 U.S.C. § 853(p)).**[9]**

"Historically, statutes authorizing in rem forfeiture reached only items that were themselves involved in illegal conduct, not items that simply were purchased with the proceeds of such conduct. The use of in rem process against

---

**[8]** 18 U.S.C. §§ 981(a)(1)(C), (f). 18 U.S.C. § 1956(c)(7) defines "specified unlawful activity" to generally include "any act or activity constituting an offense listed in section 1961(1) of this title." 18 U.S.C. § 1961(1) covers acts indictable under "section 1343 (relating to wire fraud)."

**[9]** 28 U.S.C. § 2461 makes 21 U.S.C. § 853(p) applicable to the current proceedings.

the latter items is a modern development."[10]  Forfeiture is not the same as other criminal penalties, though it functions as a deterrent to crime.  Very commonly, civil in rem actions are filed in the district courts against sums of money, ships, and automobiles independently of any proceedings against the criminals whose conduct tainted the property.[11]  For example, in Alaska, the federal government files many forfeitures against ships for involvement with illegal fishing, without any charges against the companies that own the ships.[12]  Until curative legislation was promulgated twenty years ago,[13] innocence was no defense to forfeiture.

*Calero-Toledo v. Pearson Yacht Leasing Co.*[14] illustrates the injustice to innocent owners prior to the Civil Asset Forfeiture Reform Act.  The Supreme Court held that the owner of a yacht, who was neither involved in nor aware that

---

[10] Caleb Nelson, *The Constitutionality of Civil Forfeiture*, 125 Yale L.J. 2446, 2455 (2016).

[11] *See, e.g.*, *United States v. Approximately $1.67 Million (US) in Cash, Stock & Other Valuable Assets Held by or at 1) Total Aviation Ldt.*, 513 F.3d 991 (9th Cir. 2008) (affirming district court's summary judgment for United States in its civil forfeiture action); *United States v. Kaiyo Maru No. 53*, 699 F.2d 989 (9th Cir. 1983) (reviewing an action filed by the federal government seeking forfeiture of a Japanese stern trawler); *United States v. One 1976 Porsche 911S, Vin 911-6200323, California License 090 NXC*, 670 F.2d 810 (9th Cir. 1979) (affirming forfeiture of automobile after marijuana discovered in trunk); *see also* Fed. R. Civ. P. Supp. Admiralty and Mar. Claims C (In Rem Actions: Special Provisions).

[12] *See, e.g.*, *Kaiyo Maru No. 53*, 699 F.2d at 991–93.

[13] Civil Asset Forfeiture Reform Act of 2000, Pub. L. No. 106-185, § 2, 114 Stat. 202, 206–07 (codified at 18 U.S.C. § 983(d)).

[14] 416 U.S. 663 (1974).

the lessees had marijuana on board, nevertheless had no protected property right to what had been his yacht.[15]  The owner of a leased yacht forfeited the yacht because one marijuana cigarette, evidently brought on board by his lessee or the lessee's guest, was found on board.[16]  At that time, "[d]espite [the] proliferation of forfeiture enactments, the innocence of the owner of property subject to forfeiture [had] almost uniformly been rejected as a defense."[17]

As the Court explained, forfeiture traces from the English common law concept of deodand (having been given to God).[18]  The deodand concept, in turn, traces in part from the biblical injunction that an ox that fatally gored a human was to be stoned to death.[19]  At common law, an object that caused a person's death became a deodand and was forfeited to the king in the expectation that the king would provide the money for Masses to be said for the good of the victim's soul or use the money for charity (thereby purifying the property that had been tainted by the wrongdoing).[20]  This common law origin and development explains why forfeiture is closely tied to the property involved in the criminal conduct, as opposed to a criminal fine or restitution, which depends on guilt but not on any taint on the criminal's property.  Both the

---

[15] *See id.* at 665–68, 680–90.

[16] *See id. at* 693 (Douglas, J., dissenting).

[17] *Id.* at 683 (majority opinion).

[18] *Calero-Toledo*, 416 U.S. at 680–81, 681 n.16.

[19] *Id.* at 681 & n.17.

[20] *See id.* at 680–81.

possibility that the value of the forfeited property may be greater than the maximum fine that could be levied, and the limitation of forfeiture to tainted property, distinguish this mechanism from other sorts of criminal penalties. Though forfeiture performs many of the same social functions as fines and restitution orders, its mechanics are different because of its unique conceptual basis.

This conceptual difference underlies the recent decision that counsel and the district court wrestled with in this case, *Honeycutt v. United States*. Tony Honeycutt owned a hardware store that sold an iodine-based water-purification product.[21] He employed his brother, Terry, to manage sales and inventory.[22] Terry, the store manager, became suspicious of customers buying iodine crystals in large quantities, so he called the police.[23] The police told him that iodine could be used to manufacture methamphetamine and advised him to cease selling the product if it made him uncomfortable.[24] Despite learning this, the store continued to sell large quantities of iodine to methamphetamine manufacturers.[25]

After both Honeycutt brothers were indicted, Tony pleaded guilty, but Terry went to trial and was convicted of

---

[21] *See Honeycutt*, 137 S. Ct. at 1630.

[22] *Id.*

[23] *See id.*

[24] *Id.*

[25] *Id.*

conspiracy to sell and distribute the iodine crystals.[26]  The government sought criminal forfeiture money judgments against each brother for the total profits from the sales, $269,751.98.[27]  Tony, the store owner who had pleaded guilty, agreed to forfeit $200,000, so the government sought forfeiture of the remaining $69,751.98 from Terry, the store manager.[28]  The district court did not enter a forfeiture judgment against Terry because Terry was merely a salaried employee and had not personally received any of the profits from the sales.[29]

The Sixth Circuit reversed, holding that, because the brothers were co-conspirators, they were jointly and severally liable for the proceeds and each bore full responsibility for the entire forfeiture judgment.[30]  That is similar to what the district court did in this case.  The Supreme Court reversed the Sixth Circuit, holding that, in a conspiracy, a defendant may not, for purposes of forfeiture, be held jointly and severally liable "for property that his co-conspirator derived from the crime but that the defendant himself did not acquire."[31]

---

[26] *See id.* (citing 21 U.S.C. §§ 841(c)(2), 843(a)(6), 846).

[27] *See id.* at 1630–31.

[28] *See id.*

[29] *Id.* at 1631.

[30] *Id.*

[31] *Id.* at 1630, 1635.

The Court explained that "[c]riminal forfeiture statutes empower the Government to confiscate property derived from or used to facilitate criminal activity," thereby "separating a criminal from his ill-gotten gains," as well as facilitating restitution and "lessening the economic power of criminal enterprises."[32]  Joint and several liability is a creature of tort law, which allows a plaintiff to recover up to the full amount of his judgment from any defendant if multiple defendants are legally responsible for the harm.[33]

The Court gave an example to illustrate joint and several liability in the context of forfeiture: a farmer who runs a marijuana business and recruits a college student to sell the marijuana on the student's campus.[34]  The farmer earns $3 million, but he pays the student only $300 a month, or $3,600 per year.[35]  Under joint and several liability, the student would be liable for the proceeds of the scheme, $3 million.[36]  Under the Court's analysis, he would not forfeit $3 million because he only "personally acquired" $3,600.[37]

The Court held that the 21 U.S.C. § 853 provisions limit forfeiture to "tainted property," and the forfeiture statute

---

[32] *Id.* at 1631 (quotation marks and brackets omitted) (citing *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 629–630 (1989)).

[33] *See id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *Id.* at 1631–32.

"does not countenance joint and several liability, which, by its nature, would require forfeiture of untainted property."[38] The key word in the statute was "obtain," and even if the farmer had customers pay the student, who then turned the money over to the farmer, the farmer "ultimately 'obtains' the property—whether 'directly or indirectly.'"[39]

The criminal forfeiture statute "maintain[ed] traditional *in rem* forfeiture's focus on tainted property."[40]   This limitation, together with the statute's text, foreclosed joint and several liability.[41]  The manager brother was held not to have "obtained" tainted property, even though the property passed from the iodine crystals purchasers into his hands before going to his brother.[42]  He could not be subjected to any forfeiture at all.[43]

Our sister circuits are split on whether *Honeycutt* applies to 18 U.S.C. § 981.  The Third Circuit, in *United States v. Gjeli*[44] holds that the text and structure of  Section 981 is "substantially the same" as the forfeiture statute in *Honeycutt*, so *Honeycutt* applies with equal force to 18 U.S.C.

---

[38] *Id.* at 1632.

[39] *Id.* at 1632–33.

[40] *Id.* at 1635.

[41] *Id.* at 1633.

[42] *See id.* at 1630–31, 1635.

[43] *Id.* at 1635.

[44] 867 F.3d 418 (3d Cir. 2017).

§ 981(a)(1)(C).[45]  On the other hand, the Sixth Circuit, in *United States v. Sexton*,[46] holds that *Honeycutt* does not apply to 18 U.S.C. § 981(a)(1)(C).[47]  It reasoned that, unlike the statute at issue in *Honeycutt*, 18 U.S.C. § 981(a)(1)(C) does not limit the forfeiture to proceeds "the person obtained."[48] So, even though the forfeited property has to be traceable to the crime, it does not need to have been received by the individual forfeiting it.[49]  The Eighth Circuit has joined the Sixth Circuit in holding that *Honeycutt* does not apply to forfeitures under 18 U.S.C. § 981(a)(1)(C).[50]

We agree with the Third Circuit.  We hold that *Honeycutt* does apply to 18 U.S.C. § 981(a)(1)(C).   The textual differences between it and 21 U.S.C. § 853 appear to us to be immaterial, in light of the reasoning and language in *Honeycutt*.  *Honeycutt* treats forfeiture, in accord with its development at common law over many centuries, as applicable only to "tainted" property.  The property carries the taint, as in *Calero-Toledo*.[51]  Although the phrase "the person obtained" does not appear in Section 981, the statute's

---

[45] *Id.* at 427–28, 427 n.16.

[46] 894 F.3d 787 (6th Cir. 2018).

[47] *Id.* at 799.

[48] *Id.*

[49] *Id.*

[50] *United States v. Peithman*, 917 F.3d 635, 652 (8th Cir.), *cert. denied*, 140 S. Ct. 340 (2019).

[51] *Calero-Toledo*, 416 U.S. at 684.

language similarly limits forfeiture to tainted property. The forfeited "property," under Section 981(a)(1)(C), has to be "traceable" to the proceeds "derived" from the wire fraud. Also, the absence of the phrase, "the person obtained" in Section 981 strikes us as immaterial in light of the reasoning in *Honeycutt*, that "the most important background principles underlying § 853" are "those of forfeiture."[52]  The same principles animate Section 981.  The text of this statute and its roots in common law forfeiture, like the statute in *Honeycutt*, necessitate a connection to tainted property.

Granted, Section 981(a)(1)(C) is not strictly limited to the "tainted" property itself, such as the ox in the Bible, because it extends to "proceeds traceable" to the tainted property. This is broader than the traditional notion of deodand,[53] but it does not, and cannot under *Honeycutt*, extend to all the criminal's property, "traceable" or not.  Such an application would be inconsistent with the common law conception of forfeiture upon which the statute rests.  There is nothing in the text of Section 981 that extends forfeiture to property of a defendant that is not traceable to the proceeds of the crime (outside the procedures set forth in Section 853(p)).

That leaves for our consideration only the question whether the district court's forfeiture judgment did or did not impose joint and several liability.  As the Court explained in *Honeycutt*, the concept of joint and several liability comes from tort law, not criminal law.

---

[52] *Honeycutt*, 137 S. Ct. at 1634.

[53] *See Nelson*, *supra* note 10, at 2475–76.

In tort law, several liability distinguishes the amount owed by one defendant from the amount owed by another.[54] Joint liability means that each wrongdoer owes the victim the full amount of the damages.[55]  Thus, each tortfeasor is "liable for the entire damage done, although one might have battered, while another imprisoned the plaintiff, and a third stole the plaintiff's silver buttons."[56]  In modern times, if two drivers negligently cause an accident creating $100,000 in damages to a victim, the victim is entitled under joint and several liability to collect the $100,000 from either one of the tortfeasors, whether he gets a portion from each driver or the entire amount from only one.  The tortfeasors are left to whatever remedies in the nature of contribution or indemnity that they may have against each other.[57]

Applying joint and several liability to criminal forfeiture would have meant that, in *Honeycutt*, the government could have forfeited the entire proceeds of the conspiracy from the store manager, and left it to him to pursue his brother, the owner of the store with whom all the profits came to rest. And in the Court's hypothetical case, the government could, if conspirators were jointly liable, obtain by forfeiture the entire $3 million from the college student who dealt the marijuana, or however much it could get from him, instead of limiting his forfeiture to the $3,600 the farmer paid him.

---

[54] *See* Restatement (Third) of Torts § 11 (Am. Law Inst. 2000).

[55] *See id.* § 10.

[56] Prosser & Keeton on Torts § 46 (W. Page Keeton et al. eds., 5th ed. 1984) (citing *Smithson v. Garth* (1601) 83 Eng. Rep. 711, 3 Lev. 324).

[57] *See* Restatement, *supra* note 54, §§ 22–23.

In the case before us, we cannot see how the district court's judgment can be viewed as anything but joint and several liability. While the judgment may not use the express words "joint and several" with regards to forfeiture, the district court granted a forfeiture order against Thompson for the whole amount of the proceeds from the conspiracy, despite the fact that some of the proceeds came to rest with Fincher and not Thompson. The district court also held Fincher liable for the entire $160,000 in proceeds from the Idaho fraud, even though apparently much less came to rest with him. No finding was made establishing what came to rest with Nixon, though Nixon's share of the loot must have reduced Thompson and Fincher's share. As in many thefts, after obtaining the loot, the thieves divided it up.

Under Section 981, forfeiture cannot extend beyond the tainted property and proceeds traceable to it, such as the pickup truck Fincher bought with the stolen money. Yet the money judgments against Thompson and Fincher were not based on findings of how much of the proceeds came to rest with them, nor has the government shown that it complied with Section 853(p) to obtain substitute property. To forfeit money from Thompson, the district court was required by Section 981 to find that the amount forfeited came to rest with him as a result of his crimes. The same goes for Fincher. The district court made no findings establishing how the loot was divided among the conspirators.

The government argues that the forfeiture orders were appropriate because the fraud proceeds passed from the victims to the trust and escrow accounts of the three separate lawyers in Georgia, Nevada, and Virginia (for the Idaho, Montana, and North Carolina frauds, respectively). The theory is that because the swindlers directed the money to the

escrow accounts, they each received all the money. That theory cannot withstand the holding in *Honeycutt*, that the college student and the store manager, who each at some point had physical control of all the money, were nevertheless not subject to forfeiture for money that did not come to rest with them.

In this conspiracy, as in many, physical control over the property changed from time to time. That was true of the store manager in *Honeycutt*, the student marijuana dealer in the hypothetical case in *Honeycutt*, and in any conspiracy where the co-conspirators do not all jointly control all the proceeds all the time. The split may occur after the proceeds are received, as when the store manager in *Honeycutt* passed the money in his cash register over to his brother the store owner, and in the hypothetical case where the salaried college student passes the proceeds of his marijuana sales over to the farmer, and in a simple bank robbery, where the split is accomplished after the getaway.

*Honeycutt* does not allow for an interpretation that any conspirator who at some point had physical control is subject to forfeiture of all the proceeds. This case would be different if, say, Thompson and Fincher had a joint bank account, or were married tenants by the entirety in a house they bought with the stolen money. If the money came to rest in a joint account, or property owned jointly or as tenants by the entirety, the swindlers would each have an unfettered right to enjoy the whole, as in *United States v. Cingari*.[58] But here, the trust accounts and escrows were stops on the way to splitting up the money, not jointly controlled deposits where the money came to rest after the swindlers split it up.

---

[58] 952 F.3d 1301, 1306 (11th Cir. 2020).

The liability that the judgment imposed on Thompson and Fincher for more, in total, than they each acquired in their swindles amounts to joint and several liability, regardless of whether the district court called it that. And it conflicted with our interpretation of forfeiture in *United States v Nejad*,[59] holding that when Section 853 applies, "the government may not enforce a personal money judgment through the same means it would use to enforce an ordinary *in personam* civil judgment."[60] Rather, the government must establish that the requirements of Section 853 have been met before forfeiting untainted property.[61]

Because the forfeiture judgment against Thompson and Fincher amounted to joint and several liability contrary to *Honeycutt*, we must vacate and remand it. On remand, the district court should make findings denoting approximately how much of the proceeds of the crime came to rest with each of the three conspirators, Thompson, Fincher, and Nixon. Though no forfeiture judgment was issued against Nixon, neither Thompson nor Fincher can be subjected to forfeiture of amounts that came to rest with Nixon, since those amounts were not proceeds that came to rest with them. The forfeiture judgments must be separate, for the approximate separate amounts that came to rest with each of them after the loot was divided among the swindlers.

The district court should determine how our recent decision in *Nejad* will apply. As in *Nejad*, control over the

---

[59] 933 F.3d 1162 (9th Cir. 2019).

[60] *Id.* at 1166.

[61] *Id.*

forfeiture process lies with the court, not with the prosecution.  Only when the procedures under Section 853(p) are followed may the government satisfy a personal money judgment from a defendant's untainted assets.[62]  The numbers used throughout this opinion of course may be approximate because swindlers and other criminals may be less than honest and conscientious about their bookkeeping and testimony about what each of them ended up with.

In the end, the prohibition on joint and several liability in forfeiture judgments may not make much of a difference for these particular swindlers.  Thompson and Fincher jointly owe restitution under their sentences, in addition to their forfeitures and prison sentences.  The forfeitures, though, cannot, under *Honeycutt*, be joint as well as several.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**

---

[62] *Id.*